No. 21-13458

In the

# United States Court of Appeals

### For the Eleventh Circuit

**MGFB PROPERTIES, INC.,**
**FLORA-BAMA MANAGEMENT, LLC, and**
**FLORA-BAMA OLD S.A.L.T.S., INC.,**

　　Plaintiffs-Appellants,

*v.*

**VIACOMCBS, INC.,**
**495 PRODUCTIONS HOLDINGS, LLC, and**
**495 PRODUCTIONS SERVICES, LLC,**

　　Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Florida

## BRIEF OF APPELLANTS

William F. Cash III
Troy A. Rafferty
Joshua R. Harris
**LEVIN, PAPANTONIO, RAFFERTY,**
**PROCTOR, BUCHANAN, O'BRIEN,**
**BARR, & MOUGEY, P.A.**
316 S. Baylen Street #600
Pensacola, FL 32502
Phone: 850-435-7059

Fred H. Perkins
**MORRISON COHEN LLP**
909 Third Avenue
New York, NY 10022
Phone: 212-735-8647

## CERTIFICATE OF INTERESTED PERSONS

For the corporate disclosures required by Fed. R. App. P. 26.1(a), Appellant MGFB Properties, Inc. states that it has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock. As for the two Appellants that are LLCs, they also state that no publicly held corporation owns 10% or more of them.

The following persons or entities may be persons with an interest in this appeal:

| |
|---|
| 495 Productions Holdings, LLC |
| 495 Productions Services, LLC |
| Bogle, Brandon L. |
| Bowden, Wesley A. |
| Carlton Fields, P.A. |
| Cash III, William F. |
| Davis, Christine R. |
| Davis Appeals, PLLC |
| Flora-Bama Management, LLC |
| Flora-Bama Old S.A.L.T.S., Inc. |
| Hon. Frank, Michael J. |
| Gilchrist, Joseph |
| Harris, Joshua R. |

Hon. Hinkle, Robert L.

Jaffré, Rémi J.D.

Jenner & Block LLP

Katherine L. Burkhart

Kohlmann, Susan J.

Lamb, Brittany R.

Levin, Papantonio, Rafferty, Proctor, Buchanan,
O'Brien, Barr, & Mougey, P.A.

McClellan, Patrick

McInnis, John

MGFB Properties, Inc.

Morrison Cohen LLP

National Amusements, Inc.

Papantonio, Michael J.

Pass, Robert W.

Perkins, Fred H.

Price, Cameron

Proctor, Mark J.

Rafferty, Troy A.

Schultz, Matthew D.

Stein, Alison I.

Tracer, Jacob

Unikowsky, Adam

ViacomCBS, Inc. (formerly: Viacom, Inc.)

Viacom International Inc.

Wong, Ethan

Y. David Scharf

/s/ William F. Cash III

William F. Cash III

*Attorney for Appellants*

Dated: January 10, 2022

## STATEMENT REGARDING ORAL ARGUMENT

The Appellants do wish to present oral argument and will do so at the Court's

direction.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... v

TABLE OF CITATIONS ...................................................................... viii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ...................................................... 1

STATEMENT OF CASE ....................................................... 1

SUMMARY OF ARGUMENT ............................................................. 18

ARGUMENT ................................................................................. 21

    I.    The applicable standards of review ........................................ 21

    II.    The district court misapplied First Amendment principles, including the "confusingly similar titles exception" to Rogers v. Grimaldi and its progeny....................................................................................... 22

        A.    The district court properly recognized that the confusingly similar titles exception was applicable, and it should have applied the standard likelihood-of-confusion factors without imposing a heightened standard on Plaintiffs.................................................... 22

        B.    Even if First Amendment interests still need to be "balanced" when confusingly similar titles are at issue, the district court misconstrued and misapplied the law to the relevant facts. ............. 26

            1.    Balancing the parties' interests in a confusingly similar titles case does not require a heightened likelihood of confusion showing...................................................................... 27

            2.    Balancing the Plaintiffs' trademark rights and First Amendment interests with Defendants' First Amendment

interests, there is no need to tip the scales in favor of Defendants. ................................................................ 30

II.   The district court improperly applied the summary judgment standard, acting as a finder of fact, contrary to precedent. ....................... 37

    A.   Factor 6: Intent to misappropriate the plaintiffs' goodwill. ............... 39

    B.   Factors 3 and 4: Similarity of the parties' goods and services, trade channels and customers. ......................................................... 48

    C.   Factor 7: The existence and extent of actual confusion in the consuming public. ................................................................................ 51

CONCLUSION ................................................................... 54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS ............. 56

# TABLE OF CITATIONS

## Cases

*AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986) ........................................ 38

*Apollo Theatre Found., Inc. v. W. Int'l Syndication*,
2005 WL 1041141 (S.D.N.Y. May 5, 2005) ........................................ 24

*Brown v. Showtime Networks, Inc.,* 394 F. Supp. 3d 308 (D. Vt. 2020) .................... 30

*Cliffs Notes Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*,
886 F. 2d 490 (2d Cir. 1989)........................................................... 26, 27

*Club Mediterranean v. For Searchlight Pictures, Inc.,* No. 04-20273-CIV,
2004 WL 5589591 (S.D. Fla. Feb. 13, 2004) ........................................ 30

*Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2003) ................................................. 37

*Custom Mfg & Eng'g v. Midway Servs., Inc.*, 508 F.3d 641 (11th Cir. 2007) ............. 44

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014)........................... 40

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*,
830 F.3d 1242 (11th Cir. 2016) ..................................................... 38, 49

*Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330 (11th Cir. 1999) ............... 49

*Gordon v. Drape*, 909 F.3d 257, 265 (9th Cir. 2018)................................................. 30

*Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286 (11th Cir. 2006) .......... 21

*J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778 (11th Cir. 2020) ............. passim

*Legacy Entm't Grp., LLC v. Endemol USA Inc.*, No. 3:15-cv-252-HES-PDB,
2015 WL 12838795 (M.D. Fla. Sept. 30, 2015) ................................................. 24

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211 (11th Cir. 2008) ........... 39

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) ........................................32, 33

*Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188 (11th Cir. 2001) ............. 49

*Playnation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159 (11th Cir. 2019).................... 51

*Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883 (N.D. Cal. 2010) ....................... 34, 36

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ...................................... 14, 18, 22, 27

*Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160 (11th Cir. 1982).......51

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
   983 F.3d 1273 (11th Cir. 2020) ............................................................. 40

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
   749 F. Supp. 1243 (S.D.N.Y. 1990) ...................................................... 24

*Twentieth Century Fox TV v. Empire Distrib. Inc.*, 875 F.3d 1192 (9th Cir. 2017) ..... 26

*Twin Peaks Prods. v. Publ'ns Int'l Ltd.,* 996 F.2d 1366 (2d Cir. 1993) ................. 28, 30

*Univ. of Ala. Bd. of Trs v. New Life Art, Inc.,*
   683 F.3d 1266 (11th Cir. 2012)............................................. 19, 26, 30, 31

*Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535 (11th Cir. 1985) .......................... 52

*Viacom Int'l v. LJR Capital Investments, L.L.C.*, 891 F.3d 178 (5th Cir. 2018) ........ 50

*Warner Bros. Entm't v. Global Asylum, Inc.*, No. CV12-9547PSG(CWx),
   2013 WL 12114836 (C.D. Cal. Jan 29, 2013) ............................................32, 33, 34

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000) ........... 30

## Statutes

28 U.S.C. § 1331 ........................................................................................... 1
28 U.S.C. § 1367 ........................................................................................... 1

## Rules

Fed. R. Civ. P. 56(a) ...................................................................................... 38

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331, federal question jurisdiction, and Section 1367, which provided for supplemental jurisdiction.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the district court entered a final judgment against the appellants on September 22, 2021. Notice of appeal was timely filed on October 6, 2021 and amended on November 10, 2021. This Court noted probable jurisdiction.

## STATEMENT OF ISSUES

1. Having properly recognized the applicability of the "confusingly similar titles" exception to the First Amendment defense to a trademark infringement claim, did the district court improperly require a heightened showing of a likelihood of confusion between the competing marks?

2. Did the district court improperly decide disputed factual issues in favor of the Defendants, and then erroneously use its conclusions on those issues to support its finding that there was no likelihood of confusion between the parties' marks?

## STATEMENT OF CASE

This is a trademark dispute between the Plaintiffs-Appellants, owners and licensed operators of the Flora-Bama Lounge, Package and Oyster Bar ("Flora-Bama Lounge") and related establishments—which grew from a beachfront lounge and package store into a legendary music and entertainment complex—and the

1

Defendants-Appellees, creators and distributors of a "reality" television series known as *Floribama Shore*.

Plaintiffs are MGFB Properties, Inc., Flora-Bama Management, LLC and Flora-Bama Old S.A.L.T.S., Inc. MGFB Properties is an asset holding company that owns the "Flora-Bama" trademarks at issue and the property on which the Flora-Bama Lounge and related establishments are located. (Tab 1, Compl. ¶¶ 21–27.) The other entities are operating companies. *Id.*

The Flora-Bama Lounge has been in operation since 1964, at the same location, on the Florida/Alabama state line. The businesses located there include the Flora-Bama Lounge, the Flora-Bama Ole River Grill, the Flora-Bama Liquor & Lotto, and the Flora-Bama Yacht Club. ¶¶ 38–40.

The Plaintiffs and their predecessors in interest have continuously used the "Flora-Bama" trademarks in connection with their entertainment, food and drink establishments and for related goods and services. MGFB Properties owns several "Flora-Bama" trademarks, which are the subject of both federal, Florida, and Alabama trademark registrations. (Tab 1, Compl. Exs. A–D.) Plaintiffs' primary Flora-Bama federal registration, Reg. No. 4272440, has incontestable status under the Lanham Act. (Tab 1, Compl. Ex. A). Among the entertainment services covered by that registration are: arranging, organizing, conducting, and hosting social

entertainment events; entertainment services in the nature of live musical performances; entertainment services, namely, conducting contests; and organizing sporting events. *Id.*

Since the 1980's, the Flora-Bama Lounge has hosted numerous entertainment and athletic events including the "Frank Brown Songwriter's Festival," the "Interstate Mullet Toss," which is an annual fish-throwing contest, various runs and triathlons, and other events. (Tab 1, Compl. ¶ 43.) These entertainment events attract thousands of participants from across the country. Annually, Plaintiffs host over one million visitors at the Flora-Bama Lounge and related establishments. (Tab 103–45, McInnis Dep. 205:8–17.) While many of the Plaintiffs' customers come from Florida, Alabama, and the Southeast, they do come from all fifty states—given that the area is right in the middle of a tourism hotspot. As the district court recognized, the Flora-Bama Lounge and related establishments have become "regionally famous." (Tab 188, Order Granting Summ. J. at 1.)

The Flora-Bama Lounge and the "Flora-Bama" trademark has been celebrated and featured in the titles of various artistic works, including works in film, television, videos, radio, books, and song. (Tab 1, Compl. ¶¶ 42–43, 46–47.) Jimmy Buffet's song "Bama Breeze" is about the Lounge, and he also sings about it in "Ragtop Day." *Id.* ¶ 31. The greatest ode to the Flora-Bama Lounge is by country

megastar Kenny Chesney, who performed the song *Flora-Bama* on the Plaintiffs' beachfront stage for more than 40,000 people at a 2014 concert co-produced by Plaintiffs—the "*Flora-Bama Jama*." *Id.* ¶¶ 33–35. The *Flora-Bama Jama* was broadcast by Defendant Viacom as "Kenny Chesney Live at the Flora-Bama" on the CMT Country Music Television channel. *Id.* ¶ 36.

Plaintiffs have also produced or co-produced three films in which the "Flora-Bama" name and mark was a prominent and licensed part of the title. (Tab 103–89, McInnis Decl. ¶ 14; Tab 103–27, McInnis Dep. 157:10–158:18, 159:20–24, 185:11–186:1, 195:4–14, 196:4–8; Tab 103–100, Pls.' Interrog. Resp. at 19.) Plaintiffs have licensed "Flora-Bama" for use in the titles of two other songs and four books. (Tab 103–89, McInnis Decl. ¶ 14; Tab 103–100, Pls.' Interrog. Resp. at 17, 19). Most recently, Plaintiffs have licensed their trademark to iHeart Radio for a nationally-distributed satellite/internet radio station licensed and branded as "Flora-Bama Radio." (Tab 103–27, McInnis Dep. 49:20–50:4, 54:19–55:7.) Plaintiffs have approved and controlled the content of all such licensed works and received substantial promotional benefits from them. (Tab 103–89, McInnis Decl. ¶ 14; Tab 103–27, McInnis Dep. 152:5–13; Tab 103–45, McInnis Dep. 189:7–23, 191:6–192:14, 192:25–194:15, 195:11–196:14; Tab 103–101 (license agreement).)

In addition to Plaintiffs' production and/or licensing of their trademark for use in the titles of various artistic works, Plaintiffs have been solicited by numerous production companies—including all Defendants, Viacom and 495 Productions—expressing interest in filming a television series based on or at the Flora-Bama Lounge. Plaintiffs recognized that the Flora-Bama Lounge would provide "an endless amount of content" and would make an extremely "valuable long-term asset" if a series focused on the Flora-Bama Lounge were to be produced and broadcast on television or through the internet. (Tab 103–27, McInnis Dep. 172:10–23, 219:17–220:5.)

Plaintiffs spent approximately $1.9 million in advertising and marketing their Flora-Bama businesses over the last 10 years. (Tab 103–98, Price Decl. ¶ 3.) Of the tens of millions in revenues they have generated in recent years, over $3 million was generated through online sales. *Id*. ¶ 4.

Plaintiffs' establishments have been the recipient of substantial, unsolicited and favorable regional and national media coverage, including in *The New York Times*, the *Huffington Post*, *Rolling Stone*, *CNN* and *Yahoo*! (Tab 1, Compl. ¶ 47.) They have also been featured on CMT in music related videos/films, in a famous John Grisham novel, *The Pelican Brief*, and received accolades from celebrities such

as Jimmy Buffett (who has played at the Flora-Bama Lounge), Blake Shelton, Taylor Hicks, John Rich, Ken Stabler and Mike Leach, among others. *Id*. ¶¶ 30–32.

The Flora-Bama Lounge received numerous "Best of" awards, including the "Best U.S. Beach Bar" (*Playboy*), "Best Beach Bar" (*Yahoo! Travel*), "One of the World's Best Beach Bars" (*CNN Travel*), "#1 Beach Bar" in the U.S. and "#14 in the world" (Microsoft's MSN search engine), and "Top 10 Beach Bars in the World" (Momondo travel web site). *Id*. ¶ 47; Tab 103–128 at MGFB40881.

Defendants are ViacomCBS Inc., and 495 Productions Holdings LLC and 495 Productions Services LLC (jointly referred to as "495 Productions"). Starting in 2017, Defendants collectively produced and distributed the TV show *Floribama Shore* on MTV, CMT, and other TV and internet platforms. (Tab 1, Compl. ¶ 66.) Years before, the same companies created the hit show *Jersey Shore*, which followed a cast of twenty-somethings doing irresponsible things on beaches, primarily on and near the actual New Jersey shore. (Tab 188, Order at 4–5.)

In developing *Floribama Shore*, Defendants were trying to strike gold twice. In their words, *Floribama Shore* is a southern-based reality TV series about a bunch of "20-somethings … who were running away from something in their lives." (Tab 103–69 at FNF35306.)

As far back as August 2011, Defendant 495 Productions repeatedly advanced the Flora-Bama Lounge as a potential venue for a TV show and for casting calls. (Tab 103–122 through 103–130 (e-mails discussing prospects); Tab 103–55, Tappon Dep. 132:12–136:24, 195:12–197:16.) In 2013, for example, a casting producer for 495 Productions wrote to Plaintiffs: "495 Productions is the production company that will be working on this (producers of Jersey Shore, Tattoo Nightmares, and many more). I have been working with the producers on determining the Location for the show. . . . I would love for them to hopefully choose [the Flora-Bama Lounge's town] for the location for the show." (Tab 103–57 at MGFB00040713.) If Viacom was not previously familiar with the Flora-Bama Lounge because of its reputation or 495 Productions's scouting activities, by October 2014, it clearly knew of Plaintiffs' fame when it broadcast *Kenny Chesney Live*.

495 Productions tried again to work with the Flora-Bama Lounge in 2014 and then in early 2017. (Tab 103–125 through 103–130 (e-mails).) In January 2017, a development executive wrote to the Flora-Bama Lounge: "I work in development at 495 Productions in Los Angeles. . . . I wanted to reach out to you about the prospective of shooting a show at Flora-Bama. . . . I came across the bar on many 'Best of' lists and it looks like the perfect location!" (Tab 103–62 at FNF00002731.)

7

While Plaintiffs allowed 495 Productions to do a few casting calls at the Flora-Bama Lounge, that was all. The Plaintiffs declined all other involvement with Defendants and certainly did not authorize any new TV show using the mark.

Defendants, however, did not take "No" for an answer. In fact, they willfully ignored the Flora-Bama's "No," and intentionally decided to steal the trademark for their new TV show.

In January 2017, during preliminary research of potential beach locations to film the TV series that eventually became *Floribama Shore*, Viacom engaged a market research company to gauge awareness and associations regarding various "Southern Beaches" and their "cultures." (Tab 103–19, Hillhouse Dep. 48:4–17, 52:4–14, 61:9–62:21, 195:10–196:17.) That research further confirmed what Defendants already knew: Flora-Bama Lounge is a "famous, open-air bar" and "'Florabama' as a term is either unknown or though[t] to refer strictly to the bar." (Tab 103–104, research report, at VIA4870, 4889.) Viacom's summary of the research reiterated: "Flora-Bama bar [is] legendary," incorporated several photos of Plaintiffs' "Flora-Bama"-branded vehicles and concerts copied directly from Plaintiffs' website, and conceded that at least half of the third party market research survey participants familiar with "Flora-Bama" understand it to refer to Plaintiffs' establishments. (Tab 103–105 at P1.0092.9, .14, .15, .17, .18.)

Viacom's research also included a map of "Flora-Bama In Detail"—showing the exact location of the Flora-Bama Lounge—and beaches stretching from Gulf Shores, Alabama to Pensacola, Florida. *Id*. at P1.0092.12.

By February 2017, while Defendants had not definitively settled on a name for their new show, they liked the sound of the "Flora-Bama" trademark—which, by then, they had confirmed was Plaintiffs' registered federal trademark. (Tab 103–108 at VIA00032816, 32826–33 (trademark search report commissioned by Defendants).) In fact, Defendant 495 Productions used the "Flora-Bama" mark *verbatim* when hiring a cast member, leasing a film location, and opening a checking account. (Tab 103–55 at 202:12–204:21, 208:1–15, 209:1–9; Tab 103–67 at FNF3021, 3023, 3031, 3032–37.)

The word "Floribama" is a direct derivation from the "Flora-Bama" mark. There is no dispute that the Defendants knew that by using the word "Floribama" for their shore *Floribama Shore*, they were copying Plaintiffs' "Flora-Bama" trademark. SallyAnn Salsano, 495 Productions's President, admitted during the show's development that Viacom was "really . . . feeling florabama . . . I know we have been to that bar before." (Tab 103–107 (e-mails) at FNF1319.) They also discussed internally the fact that no area residents call the region "Floribama." In fact, the Viacom employees were trying to describe the "Floribama" region's

9

characteristics, but noted that "the tricky thing is I'm not sure anyone actually calls it that." (Tab 103–7 (e-mail).) Another employee agreed: "Google automatically assumes you mean florabama," not the made-up "Floribama" area. *Id*.; *see also* Tab 103–4 at 137:18–139:2, 140:11–20 (discussing Tab 103–7, e-mail); Tab 103–55, Tappon Dep. 245:19-247:15.

The district court, by the way, also found that "Floribama" is not a real place. Neither Panama City Beach, where the show was first filmed, "nor any other area had ever been known as the Floribama shore. Indeed, aside from plaintiffs' mark *Flora-Bama* and a few apparently infringing marks that the plaintiffs diligently attempted to shut down, 'FloriBama' was not a thing." (Tab 188, Order at 5.)

In March or April 2017, Defendants were making a choice between two names: "*Floribama Shore*" and "*Gulf Shores.*" (Tab 103–1, French Dep. 277:11–13, 277:25–278:10.) This is proof that Defendants did not *have* to select the infringing name to make their southern beach-themed show. One network executive testified that it "didn't matter if the show was titled Gulf Shores or Floribama Shore." *Id*. at 20:23–21:13 (job title), 278:18–279:3 (didn't matter).

The Plaintiffs found out about the *Floribama Shore* name on October 30, 2017—prior to its initial air date and, as Defendants admitted, with enough time to still change the name before the premiere. (Tab 103–23, McCarthy Dep. 41:3–14.)

10

Plaintiffs immediately sent the Defendants a cease-and-desist letter regarding the imminent trademark infringement. (Tab 103–110.)

But the Defendants charged ahead anyway, launching a multi-million-dollar global advertising campaign to associate "Floribama" with their TV show, rather than Plaintiffs' fifty-three-year-old businesses and all of their goodwill.

The first season of *Floribama Shore* was filmed in Panama City Beach, over 100 miles from the Flora-Bama Lounge. (Tab 188, Order at 4.) Weeks before the show aired, Viacom's executives decided they needed to "[b]etter define" Floribama." (Tab 103–4 at 147:9–150:4; Tab 103–55 at 245:8–17; Tab 103–9 at FNF24562; Tab 103–10 (e-mail with draft lines for cast to say).) Although Defendants realized that no one actually calls the Florida panhandle area or Panama City Beach "Floribama," they concocted a non-factual "FLORIBAMA GLOSSARY," reflecting what Defendants arbitrarily deemed to be "Floribama culture." (Tab 103–8 at VIA11812; Tab 103–55 at 251:23–255:21).

Defendants also decided they would interview the show's cast on what "Floribama" meant to them, and then use those soundbites from those interviews to explain its significance in the TV show. (Tab 103–4 at 147:9–150:4; Tab 103–55 at 245:8–17; Tab 103–9 at FNF24562.) However, those interviews were "tricky" and did not shed light on the meaning of "Floribama," because—like everyone

else—no cast members actually use the word in real life. So Defendants scripted various contrived meanings for "Floribama" to read out. Critically, Defendants coached their cast: "I know, I know . . . Floribama is just a bar. Ignore that part for now." (Tab 103–11 (e-mail) at 1; Tab 103–4, French Dep. 153:17–154:18; Tab 103–55, Tappon Dep. 259:8–19, 261:2–262:12.)

The idea that "Floribama" is a real place is undercut by the scripted lines, which contradictorily defined Floribama as the "whole area from Mississippi to Alabama to Georgia to Florida," "the South—the best damn beaches on the Gulf Coast," and the version that actually made it into the show, "[t]he whole stretch of beach along the Gulf Coast from Alabama to Tallahassee." (Tab 103–11; Tab 103–55 at 257:8–258:4; Tab 103–4 at 162:20–165:25.)

*Floribama Shore* premiered in late November 2017. Immediately, patrons of the Flora-Bama Lounge and others were confused by the apparent association and connection between the *Flora-Bama* trademark and *Flora-Bama*-branded establishments and the TV show. Numerous examples of actual confusion are in the record:

- E-mails and letters intended to go to people associated with the show were misdirected to Plaintiffs instead. (Tab 103–106 (collection of e-mails, social media posts, and news); Tab 103–111). One person in New Jersey wrote to say: "I've been to your bar a few times, so when I saw the show was announced it was the first thing I thought of." (Tab 103–48.)

- A June 2017 news article featured a photo of the Flora-Bama Lounge and incorrectly stated, "the new show will be titled *Flora-Bama*, after the famous roadhouse saloon that literally sits on the border of the two states." (Tab 103–15.)

- A musician, Brittany Grimes, attested that when she informed members of the public about her frequent appearances at the Flora-Bama Lounge, they would ask her about the *Floribama Shore* show "and if I had met any of the people on the television show." (Tab 103–91.)

- A congregant attending a church service at the Flora-Bama Lounge complained to management "for allowing MTV to air such a terrible depiction of the Flora-Bama." (Tab 103–92.)

- Employees of the Flora-Bama Lounge were repeatedly asked about the show, including when certain cast members would be around. (Tab 103–93 through 103–98.)

- Numerous posts on Facebook, Twitter, Instagram, and other social media platforms expressed apparent confusion between the two businesses. (Tab 103–77, McDonald Rep.) For example, there were social media posts by people physically present at the Flora-Bama Lounge, but posting about "#florabamashore," the TV show. (Tab 103–78.) Other people directly linked the two, *e.g.*, "Florabama Shore!!?? []... Florabama is my favorite bar, ever." *Id*. Other posts showed images of the Flora-Bama Lounge but referred to it as "MTV IRL [in real life] #florabamashore" (Tab 103–77 at 91, 120, 164.)

- Plaintiffs' social media expert also showed how Viacom used its "powerful, built-in megaphone across the Internet and social media platforms to promote its TV Show to the detriment and harm of Plaintiffs and their [*Flora-Bama*] trademark." *Id*. at 187. He showed how internet searches for "Florabama" or "Flora-Bama" lead to "blurred" results filled with *Floribama Shore* content. Search algorithms and social media users alike falsely concluded that Plaintiffs' and Defendants' enterprises must be connected. *Id*. at 80, 97–98, 102, 156–60.

13

- This internet and social media confusion was fueled at least in part by Defendants' repeated use of "Florabama"—Plaintiffs' exact trademark—by 495 Productions's President, Ms. Salsano, to promote the show. For example, she posted on Twitter: "Yup one of a kind #FlorabamaShore @FloribamaShore @495Prods." (Tab 103–77 at 19-23; Tab 103–78.)

After the Defendants swamped the market with their campaign and appropriated a valuable mark for themselves, the Plaintiffs lost the right to control their own identity and destiny. Defendants took the Plaintiffs' valuable intellectual property for themselves—and without apology.

Due to the district court's decision, Defendants also took the mark without cessation or compensation. The Plaintiffs brought this Lanham Act case seeking an injunction and damages to remedy the harm their business had suffered. They sought damages for Defendants' infringing profits, lost licensing royalties, and for the costs of a corrective advertising campaign to untangle the trademark mess that the Defendants had created.

Defendants moved to dismiss this action on First Amendment grounds. In an order issued only days later, the district court denied the motion, holding that the complaint was sufficient. (Tab 33, Order at 2.) The district court also noted that, under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), "*Rogers* explicitly said its test does not apply to 'misleading titles that are confusingly similar to other titles.'

14

Whatever might be said when the actual facts are known, the complaint alleges facts sufficient to invoke the exception . . . ." *Id.* at 3.

Discovery continued for about eighteen months. On July 2 and July 9, 2021, the district court held lengthy hearings on all pretrial matters, including Defendants' motion for summary judgment, which advanced their First Amendment argument again. (Tab 154, Jul. 2 Hr'g. Tr. 18:14–21:12; Tab 160, Jul. 9 Hr'g. Tr. 3:9–20:23.)

The district court was openly inclined toward the Plaintiffs' view at both hearings. At the July 2 hearing, the district court expressed skepticism over Defendants' claim that they use the "Flora-Bama" mark in an expressive way to describe something in their own work. "[I]s the title related to the work? Well, yes, because you tried to create a use out of the plaintiffs' name that related to the work. . . . And I don't think the First Amendment says that you can take somebody's name and copy it and make use of it the way you have." (Tab 154, Jul. 2 Hr'g Tr. 20:10–15.)

The First Amendment argument continued over at the July 9 hearing. The court stated: "I am going to start writing this one on the theory that the First Amendment doesn't bar this claim." (Tab 160, Jul. 9 Hr'g Tr. 17:3–4.)

Noting that "Flora-Bama" was distinct and "a word not used anywhere else," the court challenged Defendants on the scope of their argument:

> "So, the breadth of your argument really is this, you can take a word, no matter how unique, coined by a company to describe its own mark in the entertainment business, you can deliberately copy that mark intending to get a financial, competitive advantage from using the word coined by the other company, you can put it in the title of your work, you can make it relevant by having your characters talk about it as part of the work, and you are good to go. There is [no] Lanham Act violation. Your argument really is that sweeping. Yes?"

*Id*. at 6:19–7:2. Defendants agreed: yes, their position is "that sweeping." *Id*. at 7:3–8.

The district court also expressed that the issue now at bar would likely be reviewed on appeal. "This . . . will be an issue that the Eleventh Circuit looks at de novo and they . . . will politely read it but then they will decide for themselves how they think this ought to be resolved." *Id*. at 17:18–21.

On September 22, 2021, the district court reversed its decision from the motion to dismiss stage and the indicative oral rulings from the pretrial hearings. Finding itself in uncharted waters, the district court called the First Amendment issue "close and not squarely controlled by prior decisions." (Tab 188, Order at 2.) However, the district court adopted Defendants' view of the facts and law and entered summary judgment for them on First Amendment grounds. In so doing,

the district court effectively held that the Defendants were entitled to knowingly and deliberately appropriate a trademark belonging to an established business with impunity.

In reaching that conclusion, the district court considered several factors relating to the likelihood of confusion between "Flora-Bama" used for an entertainment complex and "Floribama" used for a TV show. *Id.* at 15–21. The question of whether there's a likelihood of confusion is the subject of a genuine dispute between the parties, and it was properly addressed—and fully factually supported—in Plaintiffs' opposition brief to Defendants' motion for summary judgment. (Tab 104, Pls.' Opp. to Mot. for Summ. J. at 20–32.) But rather than leaving that genuine dispute to be resolved by the jury, the district court impermissibly made its own findings of fact and then entered judgment based on those findings.

The order granting summary judgment must be reversed for two reasons:

(1)    The district court committed an error of law, in that it misconstrued the "confusingly similar titles" exception to *Rogers* and applied a heightened proof of likelihood of confusion to Plaintiffs not grounded in law of this Circuit or *Rogers*.

(2)    The district court misapplied the summary judgment standard, and should have acknowledged the presence of evidence opposing Defendants' views on the likelihood of confusion factors. Instead of permitting a jury to make the decision, the district court improperly weighed the evidence itself.

17

This Court should reverse the district court on both points. And this case should be remanded for trial.

## SUMMARY OF ARGUMENT

*Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir. 1989) is the landmark case on the application of First Amendment principles to Lanham Act claims. In *Rogers*, the court adopted a two-prong balancing test to apply to certain situations involving a defendant's artistic work using a plaintiff celebrity's name or trademark:

> We believe that in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless [1] the title has no artistic relevance to the underlying work whatsoever, or, [2] if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

*Id*. Significantly, *Rogers* added a critical exception to the applicability of this two-prong test in a footnote at the end of this quoted passage which provides:

> This limiting construction would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles.

*Id*. at 999 n.5. That is the "confusingly similar titles" exception, and if it applies, it means that *Rogers* and the First Amendment do not shield the Defendants from Plaintiffs' Lanham Act claim.

While our Circuit adopted the two-prong *Rogers* test in *Univ. of Ala. Bd. of Trs v. New Life Art, Inc.* 683 F.3d 1266, 1278 (11th Cir. 2012), it has had no occasion to address the *Rogers* footnote exception in cases involving "confusingly similar titles." The legal question is open in this Circuit as to whether there is a First Amendment shield or not.

The district court correctly recognized that, on our facts, the "confusingly similar titles" exception applies and the *Rogers* two-prong test does not. (Tab 188, Order at 15–16.) However, rather than following the lead of courts in this Circuit and elsewhere, the district court then marked out its own path based on a misinterpretation of two Second Circuit cases and erroneously imposed a heightened burden to prove a likelihood of confusion on Plaintiffs. (188 Order at 2, 19.) Significantly, the district court expressly found that, had it not imposed this higher standard, Plaintiffs' "showing would be sufficient to withstand summary judgment." *Id*. at 19. The Court found that because Defendants had a primary intention of "expression" rather than "exploitation" of Plaintiffs' mark, a higher standard applied. *Id*. That is not consistent with the law.

19

Even if the court should have balanced Defendants' First Amendment interests with Plaintiffs' First Amendment rights to use their trademark in artistic titles and Lanham Act trademark rights to avoid confusion, summary judgment should have been denied, because there was no *need* for Defendants to use Plaintiffs' trademark. This case is not like other cases where the use of the mark was unavoidable to depict real-world events or materials. Defendants had plenty of other options to name their show that were not infringing.

The improperly heightened standard for likelihood of confusion was the district court's first error. It was infected by the district court's second error: it misapplied the summary judgment standard in reviewing the evidence in the motion record.

Like any other summary judgment decision, the district court should have reviewed the evidence in the motion record and considered whether there was a genuine dispute over material facts. When analyzing likelihood of confusion, caselaw requires a trial court to go factor by factor and analyze the evidence put forward by the non-moving party, drawing all reasonable inferences in its favor.

Plaintiffs put forward substantial evidence to support a jury finding of a likelihood of confusion between their marks and Defendants' infringing "*Floribama*

*Shore*." Since there was sufficient evidence on which a jury could find for Plaintiffs, the district court should have sent the dispute to the jury.

What the district court did instead, however, was weigh the evidence for itself and make its own factual findings. That was impermissible. To quote a factually similar, recent case from this Court, the district court here "short-circuited the jury's role as fact finder." *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 792 (11th Cir. 2020).

The district court's order must be reversed, and this case should be remanded for further proceedings and trial.

## ARGUMENT

### I.    The applicable standards of review

This Court reviews a grant of summary judgment *de novo*, applying the same legal standards as the district court. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006).

The Court also reviews the application of law *de novo*, "premised on the understanding that '[a]pplication of an improper legal standard . . . is never within a district court's discretion.'" *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246 (11th Cir. 2002).

## II. The district court misapplied First Amendment principles, including the "confusingly similar titles exception" to *Rogers v. Grimaldi* and its progeny.

The district court properly recognized the applicability of the confusingly

similar titles exception, which makes the *Rogers* two-prong test wholly inapplicable.

Although our Circuit has not yet had the opportunity to consider the appropriate

standard in cases such as this where the confusingly similar titles exception applies,

the district erred in adopting a heightened standard for likelihood of confusion,

rather than following the approach taken by other district courts and simply

applying the traditional likelihood of confusion factors. The district court made

clear, however, *had* the traditional likelihood of confusion factors been applied,

summary judgment would have been denied.

Even if this Court concludes that some balancing analysis is still required

where there are confusingly similar titles, properly balancing the parties' competing

First Amendment interests and Plaintiffs' trademark rights to avoid confusion leads

inexorably to the conclusion that summary judgment was improperly granted in

favor of Defendants.

### A. The district court properly recognized that the confusingly similar titles exception was applicable, and it should have applied the standard likelihood-of-confusion factors without imposing a heightened standard on Plaintiffs.

The two-part test of *Rogers v. Grimaldi*, 875 F.2d at 999, "does not apply to a

junior user's title that is misleading and confusingly similar to a senior user's title,"

22

and so the district court held. (Tab 188, Order at 7.) The rationale for this exception is that the "public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." 875 F.2d at 999 n. 5.

The district court applied the "confusingly similar titles" exception to the *Rogers* test because "the mark has occasionally been used in the title to artistic works, and in any event, artistic works are performed at the *Flora-Bama*." (Tab 188, Order at 15.) Among these are included the televised concert that Viacom itself broadcast nationally (*Kenny Chesney Live at the Flora-Bama)*, a 40,000-attendee concert (*Flora-Bama Jama*), two songs (*Flora-Bama* and *Flora-Bama Time*) as well as various films, books and videos (*e.g.*, *Food 'n' Fun at the Flora-Bama, Bushwacked at the Flora-Bama,* and the "Flora-Bama Spotlight" YouTube channel featuring various *Flora-Bama* entitled films and videos). (Tab 103–89, McInnis Decl. ¶ 14.)

The district court observed that the "Eleventh Circuit had no occasion to address the *Rogers* footnote," so the "law of the circuit is thus partially settled and partially unsettled." (Tab 188, Order at 9.)

However, rather than follow the decisions of various district courts from both this Circuit and the Second Circuit as to determining trademark infringement in cases involving confusingly similar titles, the court below developed its own

approach that required Plaintiffs to make a "stronger showing of likely confusion" than normally applicable in a trademark infringement action. *Id*. at 15. This was a critical error. Significantly, the district court acknowledged that but for this more stringent likelihood of confusion standard it erroneously chose to apply, "the showing [of Plaintiffs] would be sufficient to withstand summary judgment." *Id*.

In contrast to the heightened standard applied by the district court here, other courts in the Eleventh and Second Circuits have applied the standard likelihood of confusion factors to determine the merits of a trademark infringement claim involving the confusingly similar titles exception. *E.g., Legacy Entm't Grp., LLC v. Endemol USA Inc.*, No. 3:15-cv-252-HES-PDB, 2015 WL 12838795, at \*5–6 (M.D. Fla. Sept. 30, 2015) (holding that "defendant's expressive work is not entitled to heightened First Amendment protection" where plaintiff's claim is based on confusingly similar titles, and applying the Eleventh Circuit's regular likelihood of confusion factors to deny defendant's motion to dismiss); *Apollo Theatre Found., Inc. v. W. Int'l Syndication*, 2005 WL 1041141 at \*15 (S.D.N.Y. May 5, 2005) (denying defendant summary judgment on First Amendment grounds based on the *Rogers* decision, ruling that the "*Rogers* test does not apply . . . 'to misleading titles that are confusingly similar to other titles'"); *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 749 F. Supp. 1243, 1253 (S.D.N.Y. 1990) (denying defendant summary

judgment based on *Rogers*, finding defendant's reliance on *Rogers* "misplaced" as inapplicable to confusingly similar titles).

*Legacy Entertainment* explicitly considered the Eleventh Circuit's decision in *University of Alabama* as well as several cases from outside the Circuit which involved *Roger*s and confusingly similar titles. *Legacy Entertainment* at \*3. According to *Legacy Entertainment*, it "is clear that the Eleventh Circuit utilizes the 'likelihood of confusion' test in cases alleging confusingly similar titles." *Id.* at \*6 (citations omitted).

Had the district court followed these authorities and applied this Circuit's standard likelihood of confusion factors rather than the heightened test it fashioned, the result would have been different; the district court said Plaintiffs' showing would have been "sufficient to withstand summary judgment." (Tab 188, Order at 19.) The district's new test led to Plaintiffs' case being dismissed.

The issue the Court must resolve now is: should the standard likelihood of confusion factors be used when analyzing confusingly similar titles as other courts in and outside of this Circuit has held? Alternatively, should the Court simply balance the Plaintiffs' First Amendment and trademark rights against the First Amendment rights of Defendants without any inherent tilt in favor of Defendants?

**B.  Even if First Amendment interests still need to be "balanced" when confusingly similar titles are at issue, the district court misconstrued and misapplied the law to the relevant facts.**

The district court stated that it "adopts the analysis of *Rogers* and *Cliffs Notes* [*Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F. 2d 490 (2d Cir. 1989)] both cited with approval in *University of Alabama* and rejects [*Twentieth Century Fox TV v. Empire Distrib. Inc.*, 875 F.3d 1192 (9th Cir. 2017)]'s rejection of the *Rogers* footnote [the confusingly similar titles exception to the *Rogers* two-part test]." *Id*. at 14–15.

Although *University of Alabama* clearly did not involve confusingly similar titles, the district court determined that it still "must balance the interest in trademark protection against the First Amendment interest in free expression." *Id.* at 15, citing *University of Alabama*, 683 F.3d at 1277, 1278, 1282. Even assuming that balancing of those interests is required in a confusingly similar titles exception case such as this, placing its judicial thumb on the scale in favor of Defendants in the name of "balancing" the First Amendment and trademark interests was not justified by *Rogers*, *Cliffs Notes*, and *University of Alabama*. Moreover, any potentially required balancing of the relevant interests here warrants a trial on the merits of Plaintiffs' trademark infringement claims.

### 1. Balancing the parties' interests in a confusingly similar titles case does not require a heightened likelihood of confusion showing.

*Rogers* does not support the district court's heightened likelihood of confusion analysis. *Rogers* explicitly ruled that in cases of confusingly similar titles, the "public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." 875 F.2d at 999 n.5. Thus, according to *Rogers*, "balancing" of the plaintiff's and defendant's rights is already addressed by applying the confusingly similar titles exception as the plaintiff's trademark and First Amendment rights to use its trademark as the title of an artistic work inherently "outweigh" any "slight public interest" the defendant can invoke to also use plaintiff's trademark as the title of its work. *Id.*

Although the Second Circuit's approach was slightly different in *Cliffs Notes*, the outcome and the "balancing" employed there to achieve a result in favor of the defendant was justified by the strong First Amendment interest in encouraging parodies and satires—which is completely absent here. There can be no doubt that the Second Circuit's ultimate holding and "balancing" in defendant's favor in *Cliffs Notes* was based on the defendant's work being a parody and satire; the court there held that the "slight risk of consumer confusion . . . is outweighed by the public interest in free expression, *especially in a form of expression that must to some extent resemble the original*." *Cliffs Notes*, 886 F.2d at 497 (emphasis added). *Cliffs Notes* did

not require plaintiff to meet some higher standard of likelihood of confusion; rather, the Court held that its standard confusion test "is at best awkward in the context of parody, which *must evoke* the [plaintiff's] original [work]." 886 F.2d at 1293 n.3 (emphasis added).

*Cliffs Notes* repeatedly referred to the unique nature of parodies and satires "in which there is a *need* to evoke the original work being parodied" as the critical rationale for its decision. *Id.* at 1292 (emphasis added). While acknowledging the "strong public interest in avoiding consumer confusion" as required by the "*Rogers* approach," a "somewhat more risk of confusion is to be tolerated when a trademark holder seeks to enjoin artistic expression such as a parody." *Id.* at 1293. The words "parody" and "satire" are mentioned in the opinion 64 times.

By contrast, nothing about Defendants' use of "*Floribama*" is based on parody or satire. Nor was there any *need* to reference Plaintiffs' trademark or prior artistic works for Defendants' program to have an appropriate title. Defendants unequivocally admitted that it "didn't matter if the show was titled Gulf Shores or Floribama Shore." (Tab 103–1 at 278:18–279:3.)

Nor is the District Court's heightened confusion approach justified by the Second Circuit's ruling in *Twin Peaks Prods. v. Publ'ns Int'l Ltd.,* 996 F.2d 1366 (2d Cir. 1993). While that case may have involved artistic works, the plaintiff there

28

never raised the confusingly similar titles exception to *Rogers* in its appeal. *See* Br. of Pl.-Appellee in *Twin Peaks*, Nos. 92-7933, 92-7985, 1993 WL 13011779 ( Jan. 11, 1993); Reply Br., 1992 WL 12013689 ( Jan. 25, 1993) (incorrectly reported in Westlaw as Jan 25, 1992).[1] As a result, it is not surprising that the court did not address the exception in its opinion. *Twin Peaks*, 996 F.2d at 1379 (citing to *Rogers*, 875 F. 2d at 999 "(footnote omitted)"). Instead, *Twin Peaks* applied the *Rogers* two-part test of artistic relevance and explicit misleading. Because the defendant's work contained both "comment" and "substantial portions of the normally protectable expression" in plaintiff's work, there was "little question" that its use of plaintiff's trademark had artistic relevance to and *needed* to refer to plaintiff's work (even if it did so in a manner which infringed plaintiff's copyrights). 996 F.2d at 1370, 1379.

The more difficult issue that required remand to the lower court was whether the defendant's work was explicitly misleading—the second prong of the *Rogers* two-part test. It was on this issue of explicitly misleading—not confusingly similar titles—that *Twin Peaks* ruled that likelihood of confusion "must be particularly compelling." *Id.* at 1379.

---

[1] Indeed, *Rogers* was not cited by any party in their appellate briefs. *Cliff's Notes* only received passing reference as the primary issued briefed on appeal involved copyright infringement and defenses thereto. *See generally* 1993 WL 13011779; 1992 WL 12013689; Defendants' main brief, 1992 WL 12013173 (Dec. 9, 1992) and Defendants' reply brief, 1993 WL 13011780 (Jan. 11, 1993).

Accordingly, *Twin Peaks* is irrelevant to the issue before this Court of what the appropriate confusion standard should be under the confusingly similar titles exception to *Rogers* when its two-part test is inapplicable. It is not surprising therefore that numerous courts have cited *Twin Peaks* as authority for the proposition that the "*Rogers* second prong [of its two-part test – explicitly misleading] is essentially a more exacting version of the likelihood-of-confusion test." *Gordon v. Drape*, 909 F.3d 257, 265 n.7 (9th Cir. 2018); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 665 (5th Cir. 2000); *Brown v. Showtime Networks, Inc.,* 394 F. Supp. 3d 308, 320 (D. Vt. 2020); *Club Mediterranean v. For Searchlight Pictures, Inc.,* No. 04-20273-CIV, 2004 WL 5589591, at *7 (S.D. Fla. Feb. 13, 2004).

Thus, contrary to the ruling below, there is nothing in *Rogers, Cliffs Notes, Twin Peaks* or *University of Alabama* which mandates the heightened standard applied to Plaintiffs' claims here.

### 2. Balancing the Plaintiffs' trademark rights and First Amendment interests with Defendants' First Amendment interests, there is no need to tip the scales in favor of Defendants.

Adopting *Rogers* generally in cases involving "whether an artistically expressive work infringes a trademark," this Court determined in *University of Alabama* that *Rogers* "requires that we carefully 'weigh the public interest in free expression against the public interest in avoiding consumer confusion.'" 683 F.3d at 1278.

While several courts have determined that *Rogers* and any balancing test is completely inapplicable in a confusingly similar titles case such as this, if this Court nonetheless adopts a general balancing approach—but without the artificially heightened confusion standard—then an examination of the nature of Defendants' work and Plaintiffs' rights still leads to the conclusion that the decision below applied an erroneous methodology.

*University of Alabama* involved a painter whose artistic works depicted the University's football uniforms, which included various trademarks. 683 F.3d at 1269, 1275. This Court applied the *Rogers* test and found the depiction of the uniforms in the content of paintings of University football games to be artistically relevant "because the uniforms' colors and designs are *needed* for a realistic portrayal of famous scenes from Alabama football history." *Id*. at 1278 (emphasis added). This Court also found no explicitly misleading conduct that the paintings were endorsed by or affiliated with the University. *Id*. at 1279. Critically, this Court found that the interest in artistic expression outweighed the University's trademark rights where the "extent of [the painter's] use of the University's trademarks is their mere inclusion (the *necessary* inclusion) in the body of the image which [the painter] creates to memorialize and enhance a particular play or event in the University's football history." *Id*. at 1279 (emphasis added).

But unlike the paintings of historic football plays in the *University of Alabama*, it was not necessary in any way for Defendants to make use of Plaintiffs' trademark as the title of their show. The Defendants' program was not about the Flora-Bama Lounge or any other Flora-Bama-branded establishment, the music that is featured there, or even the area near the Florida/Alabama border: it was shot 100 miles away. The program is not a parody, satire, commentary, or documentary in which there was a clear First Amendment artistic need to refer to the *Flora-Bama*. There was simply no *need* for Defendants to use "Floribama" as the title of their show. It "didn't matter if the show was titled Gulf Shores or Floribama Shore." (Tab 103–1 at 278:18–279:3). Without any such legitimate need to refer to the "Flora-Bama" mark, any balancing of respective rights should tilt in Plaintiffs' favor.

This case is more like the questionable or improper use of trademarks found in *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) and *Warner Bros. Entm't v. Global Asylum, Inc.*, No. CV12-9547PSG(CWx), 2013 WL 12114836, at *1 (C.D. Cal. Jan 29, 2013), *aff'd*, 544 F. App'x 683 (9th Cir. 2013).

In *Parks*, the Sixth Circuit reversed summary judgment for defendant and remanded the case, finding that there was a genuine factual issue whether use of "Rosa Parks," the civil rights activist, as the title of defendant's song was artistically relevant to its content. *Id.* at 458. Reviewing the lyrics, which included

32

"move to the back of the bus," the court explained that *Back of the Bus* might be an obviously relevant title, but lacked the "marketing power of an icon of the civil rights movement" that "unquestionably enhanced the song's potential sale to the consuming public." *Id*. at 453. "When the phrase is considered *in the context of the lyrics* [it] has absolutely nothing to do with Rosa Parks." *Id*. at 452. Significantly, *Parks* made clear that the song was not a parody or satire "that would be protected under the broad umbrella of the First Amendment." *Id*. at 455–56. In short, the lack of relevancy and the absence of any need to refer to Rosa Parks as the title of the song caused the scales to tip in the plaintiff's favor.

In *Warner Bros. Entm't v. Global Asylum, Inc.*, No. CV12-9547 PSG(CWx), 2013 WL 12114836, at \*1 (C.D. Cal. Jan. 29, 2013), *aff'd*, 544 F. App'x 683 (9th Cir. 2013), distributors of the films based on J.R.R. Tolkien's novels "The Hobbit" and "The Lord of the Rings" overcame a *Rogers* defense and successfully enjoined defendant's film entitled "Age of Hobbits," about a "recently-discovered species of pre-historic humans that [were] . . . nicknamed 'hobbits' by scientists." Again, the film's title bore no artistic relevance to the work, in this case because the film had no characters referred to as "hobbits." *Id*. at \*1. In contrast to cases where "the trademarked term was actually used or directly referenced in the content of the underlying work," *Warner* found that for First Amendment interests to outweigh

33

trademark confusion it is "generally required that 'the artistic work targets the original [trademark legitimately] and does not merely borrow another's property to get attention.'" *Id.* at *10–11.

Not only is *Floribama Shore* not a parody or commentary, Defendants acted with unclean hands in adopting the mark—as will be discussed more fully in the section below on factor 6, Defendants' intent to misappropriate Plaintiffs' goodwill. The district court saw that: "To be sure, the defendants copied the plaintiffs' name, and copying a name often shows an intent to misappropriate goodwill." (Tab 188, Order at 18.) It also noted that, "The record gives no reason to believe that, had there been no *Flora-Bama*, the defendants would have come up with the name *Floribama Shore* on their own." *Id.*

A defendant's intention underlying use of the plaintiff's trademark for its artistic work is certainly a relevant consideration in any balancing analysis. *E.g., Parks,* 329 F.3d at 454 (considering the defendant's intentions in choosing the name of its artistic work); *Rogers*, 875 F.2d at 1001 (considering defendant's intention in choosing a title with an "ironic meaning" used for satiric purposes); *Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883, 889 (N.D. Cal. 2010) (considering defendant's intention in adopting plaintiff's trademark for its album title).

While admitting that they copied "Flora-Bama" for the name of their show, Defendants contended that they "stretched" Plaintiffs' trademark to mean Panama City Beach, Tallahassee, and the entire panhandle. (Tab 103–4, French Dep. 120:12–122:2; 123:19–124:12, 126:2–13, 160:12–25, 174:15–175:13.) Defendants also claimed they used their slight variation of "Flora-Bama" to define a subculture of people who hailed from diverse geographic locations, all for a show that could have been filmed at locations "all around the country," including Texas. *Id*. at 136:23–137:4; Tab 103–55, Tappon Dep. 100:12–15, 193:19–194:1, 234:14–238:16; Tab 103–69 at FNF35305-06 (e-mails). The Defendants' glossary ambiguously defined "Floribama" as "[a]nything related to the new South, particularly in the region of Northern Florida, where it intersects with Alabama" and said "Panama City Beach is the epicenter of FLORIBAMA culture." (Tab 103–8 at VIA11812; Tab 103–55 at 251:23–255:11.)

Put simply, Defendants took the label from Plaintiffs' mark and attached it to something that they made up. And they admitted that internally. "I know, I know . . . Floribama is just a bar. Ignore that part for now." (Tab 103–10 through 103–12 (e-mails planning scripts for cast); Tab 103–4 at 153:17–154:18; Tab 103–55 at 259:8–19, 261:2–262:12.)

Thus, Defendants did not choose *Floribama Shore* because they needed to refer to the Flora-Bama Lounge, or to any particular subculture or region where the cast came from, or where the program was filmed. They chose their name because they wanted to copy the Plaintiffs' name. Now they argue, "Well, we have ascribed their own meaning to it, so it is an expressive, protected use." As the *Rebelution* court observed, "at its logical conclusion, [this argument] would allow any person to ascribe their own meaning to a mark and thereafter argue that their artistic work bears relevance to this opportunistically-defined meaning." *Rebelution LLC*, 732 F. Supp. 2d at 889.

Neither *Rogers* nor *University of Alabama* ever intended to give infringers like Defendants endless permission to use established marks. "Poetic license is not without limits." *Rogers*, 875 F.2d at 997. Nonetheless, this unlimited purported right to use the *Flora-Bama* mark under the guise of the First Amendment is exactly what Defendants advocated, and effectively what the district court awarded them. (Tab 160, Jul. 9 Hr'g Tr. 6:19–7:7.)

The district court wrongly elevated Defendants' exercise of their First Amendment rights over Plaintiffs' First Amendment rights. In so doing, the district court below ran afoul of the "Supreme Court's teaching that there should exist no hierarchy among First Amendment rights." *Cf. Cobb v. Pozzi*, 363 F.3d 89, 105 (2d

Cir. 2003) (citing *McDonald v. Smith*, 472 U.S. 479, 482 (1985)) (it would be improper to treat First Amendment protected freedom of association right by a government employee differently than First Amendment freedom of speech right).

Accordingly, if the Court deems it appropriate to balance Plaintiffs' trademark and First Amendment rights in using the "Flora-Bama" mark in titles for their artistic works on the one hand, with Defendants' First Amendment rights on the other, then the balancing should have come out in Plaintiffs' favor. At the very least, there were materially-disputed factual issues concerning Defendants' intentions regarding use of the "Flora-Bama" trademark that precluded summary judgment.

## II.  The district court improperly applied the summary judgment standard, acting as a finder of fact, contrary to precedent.

In determining whether there was evidence that Defendants' adoption and use of the *Floribama Shore* mark created a likelihood of confusion, the district court applied this Circuit's binding precedent and its seven-factor test. (Tab 188, Order at 16–19.)

That test includes:

> (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the

> existence and extent of actual confusion in the consuming
> public.

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016).

The appropriate standard of review in a posture like this, where a party has lost on summary judgment, is to resolve all disputes in favor of the non-moving party and to draw all reasonable inferences in that party's favor—as in any other summary judgment appeal. *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 788 (11th Cir. 2020); Fed. R. Civ. P. 56(a). Further, as to the seven factors, this Court "must evaluate the evidence pertaining to **each** of these factors, and the relative importance of each factor, in a way most favorable" to the plaintiff's position that confusion would result. *Id.* at 789 (emphasis added).

No special deference is due to the district court on this standard. While in certain circumstances, this Court grants substantial deference to district courts' findings on the likelihood of confusion and applies the clear error standard— examining whether this Court is left with "a definite and firm conviction that a mistake has been committed," *e.g.*, *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986)—that is not the appropriate standard on this posture. The clear error standard of review applies only where the district court was acting as the ultimate finder of fact. *E.g.*, *Ambrit* (bench trial); *Florida Int'l University*, 830 F.3d

at 1252–53 (cross-motions for summary judgment and "better understood as a judgment entered after a bench trial"); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211 (11th Cir. 2008) (preliminary injunction before trial). The appropriate standard of review here is *de novo*.

The district court found that factor 1 (strength of the mark) weighed in favor of the Plaintiffs; factor 2 (similarity of the marks) "cuts both ways"; factors 3 and 4 (similarity of goods, trade channels and customers) weighed substantially or strongly in favor of the Defendants; factor 5 (similarity of advertising media) weighed in favor of the defendants "a little"; factor 6 (intent to misappropriate goodwill) was "neutral"; and factor 7 (actual confusion) was also "neutral." (Tab 188, Order at 16–19.) Overall, while the district court described the Plaintiffs' showing as "weak," the district court expressly held the evidence was sufficient to survive summary judgment if it were not for the heightened legal standard it decided to apply to this case. *Id*. at 19.

Plaintiffs now review some of the factors the district court analyzed, starting with Defendants' intent first.

### A.    Factor 6: Intent to misappropriate the plaintiffs' goodwill.
Perhaps one of the most misplaced parts of the district court's opinion concerns its analysis of whether the Defendants intended to misappropriate the goodwill Plaintiffs had built up in their trademark. The error here is particularly

39

compelling, given that intent to misappropriate goodwill is one of the two most important factors courts should review. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1287 (11th Cir. 2020).

As shown above, the law required the district court to draw all inferences on intent in favor of the Plaintiffs. The district court, however, did not do so. Instead, it impermissibly made a finding on intent in favor of the Defendants, taking that issue away from the jury. "Questions of intent are quintessential jury questions." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014).

The district court erred in holding—*fact-finding*—that Defendants had no intent to misappropriate Plaintiffs' goodwill—or, at best, that the evidence was "neutral." (Tab 188, Order at 18.) But there is no "neutral" position on summary judgment if the non-moving party puts forward some evidence to dispute the movant's position. Rather, the district court was required to make out Plaintiffs' "best case." *J-B Weld*, 978 F.3d at 790.

Because the district court impermissibly weighed the evidence—and came down on the side of the moving party—it committed error. As discussed later, this error on factor 6 (intent to misappropriate Plaintiffs' goodwill) is compounded— because it was *only* due to the district court's finding on the intent factor that the

court then went on to grant heightened protection to Defendants' use of Plaintiffs' mark. Here is where the court went even further off track:

> "Even so, the showing would be sufficient to withstand summary judgment, were it not for the necessity to balance the showing against First Amendment interests. . . . [T]he First Amendment interest is stronger when 'expression, and not commercial exploitation of another's trademark, is the primary intent.' Here the defendants' primary intent was expression—conveying to the audience the subject of the television series—not exploiting the plaintiffs' mark."

(Tab 188, Order at 19.) With respect, the district court had no business making its *own* finding on Defendants' intent—"primary" or otherwise—and it certainly should not have extended heightened protection to Defendants based on that improper finding.

This Court's 2020 decision in *J-B Weld* offers a very clear road map to reviewing a district court's decision on the intent factor and is illustrative of the same kinds of errors in an infringement case. Plaintiff J-B Weld manufactured a two-ingredient epoxy glue and distributed it in a distinctive package. A newcomer to the epoxy market, Gorilla Glue, copied the packaging to such a degree that its own employees admitted it was a "knock off." *J-B Weld*, 978 F.3d at 791.

This Court held that "a finder of fact may . . . infer intent to derive a benefit from a competitor's goodwill—and, accordingly, an intent to cause confusion—

from evidence of intent to copy." *Id*. at 790. It noted that "[i]ntent to benefit from a competitor's goodwill can rarely be proved with a smoking gun," so circumstantial evidence is appropriate and there is "nothing unusual about a finding of intent based on circumstantial evidence." *Id*. Where a competitor copies a mark "as closely as possible," intent to misappropriate goodwill can be inferred. *Id*. Those holdings readily apply here, because "*Floribama Shore*" is just one vowel away from "Flora-Bama," Plaintiffs' mark.

Because *J-B Weld* counsels courts to make out the plaintiff's "best case," it is difficult to see how summary judgment can be granted where there is actual evidence of an intent to copy and, as here, an incontestable mark which weighed in Plaintiffs' favor. Under *J-B Weld*, the district court should have drawn an intent to misappropriate Plaintiffs' goodwill and an intent to cause consumer confusion.

The district court in *J-B Weld* erred by crediting the movant's evidence—Defendants' proffered explanations for their infringing conduct—and then weighing in on the total value of all evidence on intent. "This was error," the Court held. *Id*. at 791. "The District Court . . . entirely ignored the possibility that a jury could infer Gorilla Glue's intent to benefit from J-B Weld's goodwill . . . ." *Id*. at 792.

42

The district court also erred by "improperly inferr[ing] innocuous motives from the testimony of Gorilla Glue's employees." *Id*. For example, in taking the issue of intent away from the jury, the district court credited Gorilla Glue employees who testified that they "sought only to compete[,] . . . not to confuse customers." *Id*. The problem this Court identified on review, "of course, is that the District Court concluded that testimony suggesting innocuous motives *must* show" a lack of intent to trade on the plaintiff's reputation. *Id*. (emphasis in original). That's error because "[t]he District Court was required to draw this inference in the light most favorable to J-B Weld, not Gorilla Glue." *Id*. This Court finally noted that "even where intent is 'innocent,' the use of a mark may nevertheless create 'a likelihood of unreasonable confusion'" in the relevant market. *Id*. at 792.

In conclusion, the *J-B Weld* Court found that the district court had "short-circuited the jury's role as fact finder," and had to be reversed. *Id*. at 792.

In the case at bar, the district court committed these exact same errors when analyzing Defendants' intent to misappropriate Plaintiffs' goodwill. This Court must now reverse for the same reasons as in *J-B Weld*.

First, there is no dispute whatsoever that Defendants deliberately copied Plaintiffs' mark, "Flora-Bama," and the district court found that "[t]o be sure, the defendants copied the plaintiffs' name." (Tab 188, Order at 18.) That is what the

Defendants consciously did. (Tab 103–107 at FNF00001319 ("They really are feeling florabama ..I know we have been to that bar before…."").)

Under *J-B Weld*, where an intent to copy is shown, the intent to misappropriate goodwill must be inferred; there is rarely a "smoking gun" to establish bad intent. *Id.* at 790. Wrongful intent can even be inferred by Defendants' intentional blindness to Plaintiffs' registered trademarks. *E.g., Custom Mfg & Eng'g v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007). In short: copying the name was enough to trigger an inference of intent to misappropriate goodwill; end of analysis on factor 6.

But leaving inferences aside, Plaintiffs also put forward substantial *actual evidence* of Defendants' intent to copy and misappropriate Plaintiffs' goodwill:

- Defendants were on actual notice that *Flora-Bama* was a registered federal trademark. They received a trademark search report for both "FLOR-ABAMA" and "FLORI-BAMA," which showed each of Plaintiffs' federal and state trademark registrations for "FLORA-BAMA." (Tab 103–108 at VIA00032816, 32826–33 (report commissioned by Defendants).) They testified they were aware "Flora-Bama" was a registered mark. (Tab 103–1 at 64:11–65:18.) There is no dispute about this.

- Defendants had seen the mark in actual use and were well aware of Plaintiffs' entertainment establishment since at least 2011. (Tab 103–122 through 103–130 (evidence that Defendants previously approached Plaintiffs to make deals).) Defendants and their agents visited the *Flora-Bama*-branded establishments and saw the mark in context, exhibiting a fun-loving beach culture similar to the one Defendants wanted to evoke in their own show.

- Defendants knew that the Flora-Bama Lounge was a thriving business. In January 2017, Viacom-commissioned research stated: Flora-Bama Lounge is a "famous, open-air bar" and "'Florabama' as a term is either unknown or though[t] to refer strictly to the bar." The research went on: "Flora-Bama bar [is] legendary," incorporated several photos of Plaintiffs' FLORA-BAMA branded vehicles and concerts copied from Plaintiffs' website, and conceded that at least half of participants in a survey who were familiar with "FLORA-BAMA" understood it to refer to Plaintiffs' establishments. (Tab 103–104 at VIA4870, 4875; Tab 103–2 at FNF2741, 2744–47, 2749–50 (research presentation).)

- Defendants knew that "Floribama" did not refer to any real geographic place. When they "Googled" the term, it took them to the "Florabama bar." (Tab 103–1 at 115:20–116:21; Tab 103–7; Tab 103–4 at 137:18–23, 140:11–20; Tab 103–55, Tappon Dep. 245:19–247:15.)

- Defendants *continued* to use Plaintiffs' trademark even after receiving a cease-and-desist letter from the Plaintiffs in 2017. (Tab 103–110.)

- ***Perhaps most egregiously of all:*** shortly before *Floribama Shore* first aired, Defendants' marketing team explicitly called for installing "a Floribama billboard as close as possible to the bar." (Tab 103–51, Parkes Dep. 154:2–155:6.

So Plaintiffs put forward strong evidence that the Defendants' intent was to trade on the goodwill in their own mark. That was sufficient evidence to demonstrate a genuine issue of fact and defeat summary judgment. But the district court's written opinion downplayed all of it, and—following the same footsteps later erased in *J-B Weld*—adopted Defendants' explanations for their misconduct rather than properly applying the summary judgment standard.

45

For example, the district court suggested that "the term 'Floribama' well describes the geographic area hosting the culture depicted on the defendants' show." (Tab 188, Order at 18.) That is expressly counter to the fact that the words "Flora-Bama" or "Floribama" is not a recognized name for the region. The trial judge *himself* dryly noted that anyone on the jury looking for a colloquial name would call that region "L.A.—Lower Alabama"—not Floribama. (Tab 154, Jul. 2 Hr'g. Tr. at 19:21-24.)[2]

The district court uncritically accepted other justifications proffered by the Defendants. For example, it noted that "*Floribama Shore* follows the pattern set by *Jersey Shore*, the first show in the series." (Tab 188, Order at 18.) How this negates Defendants' ill intent is unclear, as literally any other word used in combination with "shore" would also have continued a "pattern" of exactly two words, the second one being "shore." (Why not call the show *Facebook Shore*? That also fits the "pattern.") There's no clear basis for this holding.

The district court also noted that "the defendants' target market—a national television audience—far exceeds the reach of the plaintiffs' goodwill," which the district court found was regional in scope. *Id*. This, too, is of little real relevance.

---

[2] For better or worse, "Redneck Riviera" is equally entrenched in the pop culture. So was the commonplace phrase "the Jersey Shore." But not "Floribama."

There is no reason to permit infringement on a nationwide scale simply because the senior user's mark may have only regional fame. And, Plaintiffs do *not* concede that their mark *only* has regional fame; to the contrary, the district court's finding here overlooked evidence in the record that Plaintiffs' patrons come from all 50 states. (Tab 103–70, Albrecht Rep. 20–21.) Plaintiffs' marketing expert—whose admissibility was never ruled upon by the district court, and whose testimony therefore is in the record—reviewed and cited to customer logs and Internet traffic to establish these facts. *Id.*

Finally, the district court was simply wrong to hold that "[t]here is no reason to believe the defendants adopted *Floribama Shore* for their national television series based not on the title's own merit but to trade on the *Flora-Bama*'s regional popularity. The record does not show that the defendants intended to pirate the plaintiffs' goodwill." (Tab 188, Order at 18.) That conclusion ignores evidence that the show was heavily promoted in the Southeast region—including live events at SEC football games near Plaintiffs. (Tab 103–51 at 220:13–18; 226:3–8.) Indeed, given Defendants' long-standing familiarity with Plaintiffs, their recognition of the *Flora-Bama's* legendary reputation, Defendants' repeated desire to film a TV show at Plaintiffs' venue and their admissions that the term referred to Plaintiffs almost

47

exclusively, there is certainly at least *some* reason for a jury to find that Defendants

intentionally copied and misappropriated Plaintiffs' goodwill in their trademark.

Because there was copious evidence on which to infer an intent to

misappropriate goodwill, and *actual* evidence of an intent to infer, the district court

erred by taking this issue from the jury. With respect to the district court's hard

work in this case, reversal is required on the issue of Defendants' bad intent alone.

### B.   Factors 3 and 4: Similarity of the parties' goods and services, trade channels and customers.

The district court found that both of these factors "cut[] strongly in the

defendants' favor." (Tab 188, Order at 17.) As to similarity of goods and services,

the district court found that "[a]n oyster bar, lounge and concert venue, even with

an occasional festival or song or show, is nothing like a national television series."

*Id.* Regarding trade channels and customers, the district court concluded that the

"parties do not use the same trade channels." It found that the parties' "targeted

customers overlap," but improperly excused the overlap because the parties "are

not marketing products that compete with one another; a customer does not choose

between alternatives offered by the opposing parties." *Id.*

The district court's analysis here is flawed in several ways. First, its statement

of law regarding competition is flatly incorrect: "Direct competition between the

parties is not required for this factor to weigh in favor of a likelihood of confusion."

48

*Florida Int'l Univ.*, 830 F.3d at 1261. If anything, this Circuit has been cautious *not* to impose such a requirement. *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1339 (11th Cir. 1999) (finding clear error where a district court found in favor of defendants because customer bases did not appear to overlap).

Second, equally flawed is the district court's focus on whether a customer must choose between alternative goods offered by opposing parties, and its finding that Plaintiffs' goods and services are not like Defendants' TV show. As this Court has made clear, likelihood of confusion may exist not because consumers erroneously believe Defendants' products originate with Plaintiffs, but because they are confused into falsely believing that an affiliation, sponsorship, or other connection exists between the parties. *E.g., Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1201 (11th Cir. 2001).

Further, Plaintiffs' "scope of protection" for their trademark "is not restricted to the owner's original use"—*i.e.*, as "[a]n oyster bar, lounge and concert venue, even with an occasional festival or song or show." *Id*. Rather, under the "natural expansion" doctrine, Plaintiffs' trademark rights "extend into uses in 'related' product or service markets." *Id*. And the undisputed facts show here that, long before *Floribama Shore* was created, Plaintiffs had licensed their mark for the nationally broadcast TV show, *Kenny Chesney Live at the Flora-Bama*, and had been

repeatedly solicited to have their "Flora-Bama" establishments serve as the foundation for a nationwide TV show—*including by Defendant 495 Productions itself*. Thus, producing a national televised show certainly *was* a product or service related to Plaintiffs' mark, which was federally registered for entertainment classifications. Putting that principle into practice, consider Viacom's *own* successful suit against a restaurant whose name exploited a mark for a character from the SpongeBob cartoon universe. *Viacom Int'l v. LJR Capital Investments, L.L.C.*, 891 F.3d 178, 194 (5th Cir. 2018). Even though Viacom wasn't using the character's name in trade at the time, "Viacom could naturally develop a real The Krusty Krab restaurant based on the fictional eatery," and therefore was entitled to protect its mark in this area of natural extension. *Id*.

Third, besides the clear overlap in customers the district court recognized, the court overlooked the significant overlap in parties' trade channels. Plaintiffs generated over $3 million in revenue between 2018 and 2020 from online internet sales. (Tab 103–98, Price Decl. ¶ 4.) Similarly, Defendants generated millions of dollars in Internet sales and related revenues over approximately the same period.[3]

---

[3] To avoid any issues with financial confidentiality, the citation for this is Ex. 72 to ECF No. 103 in the district court, at Exs. 5, 5.2, and 5.3.

By failing to consider the impact of this evidence on these factors and by failing to apply the proper law, the district court's decision on the similarity of goods, services, and trade channels was also in error.

### C.  Factor 7: The existence and extent of actual confusion in the consuming public.

This is another factor where the district made a factual finding, rather than applying the summary judgment standard. There was substantial evidence probative of actual confusion in the marketplace. But the district court found this factor "neutral." (Tab 188, Order at 18–19.) The court ignored some of evidence in the record, improperly disregarded the significance of other evidence, and drew improper inferences. *Id.* The court erred by not tendering this evidence for a jury's consideration.

The bar for evidence being relevant on this factor is very low. Even "one instance of actual customer confusion [is] sufficient" to be probative of confusion among consumers. *Playnation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1168 (11th Cir. 2019) (quoting *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982)).

Here, Plaintiffs entered eight sworn declarations attesting to consumer inquiries or statements evidencing their mistaken belief in a connection between the parties:

51

- A musician who frequently performs at the Flora-Bama Lounge attested that multiple people had asked her if she had met anyone from *Floribama Shore*. (Tab 103–91.)

- One of Flora-Bama Lounge owners was criticized by a Flora-Bama patron for allowing MTV to air such a terrible depiction of the Flora-Bama Lounge. (Tab 103–92.)

- Five separate Flora-Bama Lounge employees were asked by customers about the *Floribama Shore* as if the two were connected. They were asked if any of the TV show cast members would be at the Lounge, whether they met any of the cast, whether the show is filmed at the Lounge, and were told that *Floribama Shore* show makes the Flora-Bama Lounge look like "idiots." (Tab 103–93 through 103–97.)

- Another Flora-Bama Lounge owner received photos of the TV show's in-person promotion at a SEC college football game from a friend who was "excited" by his mistaken belief that the Flora-Bama Lounge was starting its own TV show. (Tab 103–98.)

Declarations are persuasive evidence of actual confusion. *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985) (affidavits were "persuasive" when attesting to inquiries received regarding a possible connection to the defendant). Inquiries by customers as to whether they will be able to see Defendants' cast members while at Flora-Bama Lounge can certainly lead to the reasonable inference that they thought the bar was connected to the TV show. Conversely, negative disparaging reviews of *Floribama Shore* with photos of the Flora-Bama Lounge or sent to Plaintiffs' website would lead to a reasonable inference that people may not go to the Flora-Bama Lounge because they thought it

was connected to a show they did not like. (Tab 103–106 at MGFB41537; Tab 103–77 at 164.)

The district court also ignored a letter Plaintiffs tendered, from a fan of the TV cast, which she misaddressed to the Flora-Bama Lounge. (Tab 103–111.) And the district court failed to address unambiguous social media evidence. For example, one Internet user posted photos of Flora-Bama Lounge signage accompanied by the words "MTV IRL [in real life] #florabamashore." (Tab 103–77, McDonald Rep. 91, 120.)

All of this actual confusion evidence was further bolstered by the reports of two of Plaintiffs' experts—neither of whom was excluded and whose testimony therefore must be accepted as true under the summary judgment standard. The Plaintiffs tendered Prof. David Franklyn, a noted survey expert and trademark law commentator, who conducted a survey showing 22% of respondents were confused as to sponsorship or connection between the *Floribama Shore* TV show and the Flora-Bama Lounge. (Tab 103–73, Franklyn Rep. 51.) And the Plaintiffs offered Dr. Jason McDonald, a social media and internet expert, who concluded there was "substantial quantitative and qualitative evidence of . . . actual confusion" "across websites, blogs, and social media networks." (Tab 103–77 at 4.)

It is possible that the district court discounted the weight of the evidence of actual confusion in the marketplace. But where there are two possible reasonable inferences, it is reversible error for the district court to favor the conclusion adverse to the non-moving party. *J-B Weld,* 978 F.3d at 793. The district court committed that error.

*    *    *

Whether this Court looks at it factor by factor, or reviews all "likelihood of confusion" evidence as a whole, the district court erred in weighing that evidence on summary judgment rather than restricting itself to assessing whether there was a genuine material dispute. Had the district court refrained from weighing the evidence, it would have had to deny summary judgment to Defendants. Reversal is required because the district court misapplied the standard.

## CONCLUSION

The Plaintiffs-Appellants ask the Court to reverse the district court's order granting summary judgment, reinstate the complaint, and remand the action for further proceedings.

54

Dated: January 10, 2022                 Respectfully submitted,


                                         /s/ William F. Cash III

                                        William F. Cash III (Fla. Bar No. 68443)
                                        Troy A. Rafferty (Fla. Bar No. 24120)
                                        Joshua R. Harris (Fla. Bar No. 124124)
                                        **LEVIN, PAPANTONIO, RAFFERTY,**
                                        **PROCTOR, BUCHANAN, O'BRIEN,**
                                        **BARR, & MOUGEY, P.A.**
                                        316 S. Baylen Street #600
                                        Pensacola, FL 32502
                                        Phone: 850-435-7059
                                        bcash@levinlaw.com

                                        Fred H. Perkins (N.Y. Bar No. 1978337)
                                        **MORRISON COHEN LLP**
                                        909 Third Avenue
                                        New York, NY 10022
                                        Phone: 212-735-8647
                                        fhperkins@morrisoncohen.com

                                        *Attorneys for Appellants*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS**

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), this brief or other document contains 12,194 words.

This brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14pt size Equity font.

/s/ William F. Cash III
William F. Cash III

*Attorney for Appellants*

Dated: January 10, 2022