**No. 21-13458**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE ELEVENTH CIRCUIT

---

MGFB PROPERTIES, INC., FLORA-BAMA MANAGEMENT LLC, and
FLORA-BAMA OLD S.A.L.T.S. INC.,

Plaintiffs-Appellants,

v.

VIACOMCBS INC., 495 PRODUCTIONS HOLDINGS LLC, and 495
PRODUCTIONS SERVICES, LLC,

Defendants-Appellees.

———————

On Appeal from the United States District Court
Northern District of Florida Panama City Division
Case No. 5:19-cv-257-RH/MJF
The Honorable Robert L. Hinkle, United States District Judge, Presiding

---

### DEFENDANTS-APPELLEES' BRIEF

---

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6000

Christine Davis
DAVIS APPEALS, PLLC
1400 Village Square Blvd.
Suite 3-181
Tallahassee, FL 32312
(850) 739-0448

Susan J. Kohlmann
Alison I. Stein
Jacob Tracer
Rémi J.D. Jaffré
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
(212) 891-1600
skohlmann@jenner.com

*Counsel for Defendants-Appellees*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

In compliance with 11th Cir. Rule 26.1-1, the undersigned certifies that the Certificate of Interested Persons included in the Brief of Appellants is complete and correct and that Defendants-Appellees are unaware of any persons and parties having an interest in the outcome of this appeal other than those listed in the Certificate of Interested Persons included in the Brief of Appellants.

ViacomCBS Inc. (n/k/a Paramount Global*) ("ViacomCBS") states that it is a publicly traded company. National Amusements, Inc., a privately held company, beneficially owns the majority of the Class A voting stock of ViacomCBS. ViacomCBS is not aware of any publicly held entity owning 10% or more of its total common stock, i.e., Class A and Class B on a combined basis.

495 Productions Holdings LLC states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock. 495 Productions Services LLC states that it is a wholly owned subsidiary of 495 Productions Holdings LLC.

---

* Effective February 16, 2022, ViacomCBS Inc. changed its name to Paramount Global.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendants-Appellees respectfully request oral argument in this matter because this appeal raises important First Amendment issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CITATIONS ......................................................................iv

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................2

I.      Nature of the Case ....................................................................2

II.     Course of Proceedings and Dispositions in the Court Below .........................3

III.    Statement of the Facts................................................................5

        A.      Plaintiffs' Business Operations ...............................................5

        B.      Defendants' Creation of the Series...........................................7

                1.      *Initial Development*...................................................7

                2.      *Naming the Series* ....................................................10

                3.      *The Series* .............................................................12

        C.      Origins of this Lawsuit........................................................13

IV.     Standard of Review................................................................14

SUMMARY OF THE ARGUMENT ....................................................14

ARGUMENT ........................................................................................17

I.      The *Rogers* Test Governs and Compels Affirming the Judgment Below.............................................................................................17

        A.      Plaintiffs' Claims Implicate Defendants' First Amendment Rights....................................................................................17

        B.      The *Rogers* Test Applies in This Circuit and Is the Appropriate Test for Trademark Claims Implicating Expressive Works. .............18

C.    Applying the *Rogers* Test Compels Affirmance. .................................20

D.    There Is No Basis to Depart from the *Rogers* Test. ...........................22

    1.    *This Is Not a Title-Versus-Title Case* .......................................23

    2.    *This Court Should Decline to Recognize a Title-Versus-Title Exception to* Rogers. ..........................................................25

II.   The Judgment Should Be Affirmed Even if the *Rogers* Test Does Not Apply. .......................................................................................................29

A.    Even Title-Versus-Title Cases Require First Amendment Balancing. ..............................................................................................29

B.    The District Court's Balancing Test Is the Next-Best Alternative to the *Rogers* Test. ...........................................................36

C.    Summary Judgment Was Warranted Under the District Court's Test. ...........................................................................................40

    1.    *The District Court Did Not Conduct Improper Fact-Finding*. ..........................................................................................40

    2.    *The Two Critical Factors Favor Defendants* ...........................41

    3.    *The Remaining Factors Also Favor Defendants*. ....................44

III.  Defendants Were Entitled to Summary Judgment Under the Ordinary Likelihood-of-Confusion Test. ......................................................................56

CONCLUSION ..............................................................................................56

# TABLE OF CITATIONS*

**Page(s)**

## Cases

*AmBrit, Inc. v. Kraft, Inc.*,
   812 F.2d 1531 (11th Cir. 1986) ..........................................................52

*\*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................37, 53

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
   11 F.4th 26 (2d Cir. 2021) ..................................................................36

*Apollo Theater Found., Inc. v. W. Int'l Syndication*,
   2005 WL 1041141 (S.D.N.Y. May 5, 2005) ................................30, 31

*Armstrong Cork Co. v. World Carpets, Inc.*,
   597 F.2d 496 (5th Cir. 1979) ........................................................54, 55

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)...........................................................19, 27, 35

*Bleistein v. Donaldson Lithographing Co.*,
   188 U.S. 239 (1903)...........................................................33, 36, 39

*Bryant v. Jones*,
   575 F.3d 1281 (11th Cir. 2009) .........................................................42

*Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*,
   605 F.3d 931 (11th Cir. 2010) ...........................................................31

*Claybrooks v. Am. Broad. Cos.*,
   898 F. Supp. 2d 986 (M.D. Tenn. 2012) ...........................................17

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*,
   886 F.2d 490 (2d Cir. 1989) ........................................................28, 30

---

\* Authorities on which Defendants-Appellees chiefly rely are marked with an asterisk.

*Conagra, Inc. v. Singleton*,
   743 F.2d 1508 (11th Cir. 1984) ..........................................................31

*Custom Manufacturing & Engineering, Inc. v. Midway Services, Inc.*,
   508 F.3d 641 (11th Cir. 2007) ...........................................................49

*Dickinson v. Ryan Seacrest Enters. Inc.*,
   839 F. App'x 110 (9th Cir. 2020) .......................................................17

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
   983 F.3d 443 (9th Cir. 2020) .............................................................22

*Duluth News-Tribune v. Mesabi Publ'g Co.*,
   84 F.3d 1093 (8th Cir. 1996) .............................................................55

*E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*,
   547 F.3d 1095 (9th Cir. 2008) ................................................18, 20, 34

*ETW Corp. v. Jireh Publ'g, Inc.*,
   332 F.3d 915 (6th Cir. 2003) .............................................................18

*Experience Hendrix, L.L.C. v. HendrixLicensing.com, LTD*,
   766 F. Supp. 2d 1122 (S.D.N.Y. 2011) ..............................................31

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
   830 F.3d 1242 (11th Cir. 2016) ...............................................38, 39, 44

*Gordon v. Drape*,
   909 F.3d 257 (9th Cir. 2018) .............................................................21

*Grange Mut. Cas. Co. v. Slaughter*,
   958 F.3d 1050 (11th Cir. 2020) .........................................................14

*Hard Rock Café Int'l USA, Inc. v. RockStar Hotels, Inc.*,
   2018 WL 7825183 (S.D. Fla. June 13, 2018).....................................48

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
   73 F.3d 497 (2d Cir. 1996) ................................................................55

*Investacorp, Inc. v. Arabian Investment Banking Corp. (Investcorp)
   E.C.*,
   931 F.2d 1519 (11th Cir. 1991) .........................................................45

*IOW, LLC v. Breus*,
    425 F. Supp. 3d 1175 (D. Ariz. 2019) ................................................................34

*J-B Weld Co. v. Gorilla Glue Co.*,
    978 F.3d 778 (11th Cir. 2020) ...........................................................48, 49, 52

*Jackson v. Netflix, Inc.*,
    506 F. Supp. 3d 1007 (C.D. Cal. 2020) ............................................................34

*Kibler v. Hall*,
    843 F.3d 1068 (6th Cir. 2016) ..........................................................................46

*Lang v. Ret. Living Publ'g Co.*,
    949 F.2d 576 (2d Cir. 1991) .............................................................................55

*Legacy Ent. Grp., LLC v. Endemol USA Inc.*,
    2015 WL 12838795 (M.D. Fla. Oct. 1, 2015) ...........................................30, 31

*Lemme v. Nat'l Broad. Co.*,
    472 F. Supp. 2d 433 (E.D.N.Y. 2007) ..............................................................30

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
    507 F.3d 252 (4th Cir. 2007) ...........................................................................55

*Luigino's, Inc. v. Stouffer Corp.*,
    170 F.3d 827 (8th Cir. 1999) ....................................................................... 41-42

*Marco's Franchising, LLC v. Marco's Italian Exp., Inc.*,
    2007 WL 2028845 (M.D. Fla. July 9, 2007) ....................................................31

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) .............................................................18, 19, 26

*Off Lease Only, Inc. v. Lakeland Motors, LLC*,
    825 F. App'x 722 (11th Cir. 2020) ...................................................................49

*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) ............................................................19, 27, 35

*Parfums De Coeur, Ltd. v. Lazarus*,
    83 U.S.P.Q.2d 1012 (T.T.A.B. 2007) ...............................................................46

*Parks v. LaFace Records*,
   329 F.3d 437 (6th Cir. 2003) ................................................................34

*Pilot Corp. of Am. v. Fisher-Price, Inc.*,
   501 F. Supp. 2d 292 (D. Conn. 2007)....................................................42

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
   261 F.3d 1188 (11th Cir. 2001) ............................................................42

*PlayNation Play Sys., Inc. v. Velex Corp.*,
   924 F.3d 1159 (11th Cir. 2019) .....................................................49, 53

*Rebelution, LLC v. Perez*,
   732 F. Supp. 2d 883 (N.D. Cal. 2010)...................................................34

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ........................................................passim

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
   983 F.3d 1273 (11th Cir. 2020) .....................................................39, 41

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
   970 F. Supp. 279 (S.D.N.Y. 1997) .......................................................30

*State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.*,
   145 F. Supp. 3d 1154 (S.D. Fla. 2015) .................................................54

*Syler v. Woodruff*,
   610 F. Supp. 2d 256 (S.D.N.Y. 2009) ..................................................30

*Tana v. Dantanna's*,
   611 F.3d 767 (11th Cir. 2010) .......................................................41, 48

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
   295 F.3d 623 (6th Cir. 2002) ................................................................55

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
   749 F. Supp. 1243 (S.D.N.Y. 1990) .....................................................30

*Twentieth Century Fox Television v. Empire Distrib. Inc.*,
   161 F. Supp. 3d 902 (C.D. Cal. 2016) ..................................................34

*Twentieth Century Fox Television v. Empire Distrib., Inc.,
    875 F.3d 1192 (9th Cir. 2017) ....................................................................passim

Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.,
    996 F.2d 1366 (2d Cir. 1991) ...............................................................30, 37, 38

*Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.,
    683 F.3d 1266 (11th Cir. 2012) .............................. 14, 18, 20, 21, 28, 37, 39, 53

University of Georgia Athletic Association v. Laite,
    756 F.2d 1535 (11th Cir. 1985) ...........................................................................54

Viacom International v. LJR Capital Investments, L.L.C.,
    891 F.3d 178 (5th Cir. 2018) ...............................................................................43

VIP Prods. LLC v. Jack Daniel's Props., Inc.,
    953 F.3d 1170 (9th Cir. 2020) .............................................................................20

Warner Bros. Ent. v. Global Asylum, Inc.,
    2013 WL 12114836 (C.D. Cal. Jan. 29, 2013)....................................................34

Yellowfin Yachts, Inc. v. Barker Boatworks, LLC,
    898 F.3d 1279 (11th Cir. 2018) ......................................................41, 52, 55, 56

## Other Authorities

Al Burt, "The Seven Little Floridas," in Becalmed In The Mullet
    Latitudes: Al Burt's Florida (1983)...............................................................2, 46

H.R. Rep. No. 116-645 (2020)........................................................................18, 36

J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition...............................................................................42, 44, 49, 52, 55

## <u>STATEMENT OF THE ISSUES</u>

1.      Does the two-prong test in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) govern Plaintiffs' claims?

2.      Did the district court properly determine that the First Amendment bars Plaintiffs' claims as a matter of law?

## STATEMENT OF THE CASE

The thinkers ought to understand that there are seven Floridas, not one, and that it is hard to throw a single piece of wisdom over all seven without some important things sticking out the sides.

We begin with *Floribama*, the Florida of the Northwest, the one with the panhandle shape. This is mullet and collard green country. Floribamans tend toward fundamentalism in all things, and they contend that they live in the only real Florida. But, as a matter of fact, Floribamans so resemble Alabamans that it is almost impossible to tell them apart. The capital is Panama City, sometimes known as Alabama Heaven.

—Al Burt, "The Seven Little Floridas," in *Becalmed In The Mullet Latitudes: Al Burt's Florida* 4 (1983)

## I.    Nature of the Case

This is a dispute about the right to use the word "Floribama." Defendants-Appellees ViacomCBS Inc. (n/k/a Paramount Global) ("ViacomCBS"), 495 Productions Holdings LLC, and 495 Productions Services LLC (together, "495 Productions"; collectively with ViacomCBS, "Defendants") together create and distribute television programs, including the hit reality series *Jersey Shore*, which profiled a group of 20-somethings living in a beach house in Seaside Heights, New Jersey. *Jersey Shore*'s success spawned a franchise of spinoffs set in locations all over the world. When Defendants created their seventh *Shore* series set in Panama City Beach, in the Florida panhandle, they named it *MTV Floribama Shore* (the "Series").

2

Plaintiffs-Appellants MGFB Properties, Inc., Flora-Bama Management LLC, and Flora-Bama Old S.A.L.T.S. Inc. (collectively, "Plaintiffs") own and operate the Flora-Bama Lounge, Package, and Oyster Bar (the "Flora-Bama Lounge"), a bar and live music venue, and other related establishments, all located on the Florida-Alabama border. Plaintiffs sued Defendants, alleging that the Series title infringes their registered and common-law trademark "FLORA-BAMA."

As the district court found, Plaintiffs' claims fail as a matter of law. Many circuits, including this one, recognize that when a trademark claim arises from the use of a mark in the title (or content) of an expressive work, trademark law must be narrowed to accommodate the First Amendment rights of the creators of the expressive work. The district court properly granted summary judgment to Defendants on this ground, and its judgment should be affirmed.

## II.    Course of Proceedings and Dispositions in the Court Below

Plaintiffs commenced this action on August 6, 2019. Doc. 1. The district court denied Defendants' motion to dismiss on October 21, 2019. Doc. 33. Discovery proceeded through early 2021.

On April 26, 2021, Defendants moved for summary judgment, arguing that all of Plaintiffs' claims were barred by the First Amendment, and separately that there was no likelihood of confusion even without accounting for Defendants' First Amendment interests. Docs. 86, 87. The same day, Defendants filed *Daubert*

motions seeking to exclude three of Plaintiffs' four disclosed expert witnesses. Docs. 89, 92, 95. Plaintiffs filed a *Daubert* motion to exclude Defendants' rebuttal expert witness on May 24, 2021. Doc. 108. In anticipation of a trial scheduled to begin on July 26, 2021, the parties submitted pretrial papers on June 21, 2021 and a total of 11 motions in limine on July 1, 2021.

On July 2 and 9, 2021, the district court held two pretrial conferences during which it rescheduled the trial for November 8, 2021 and heard argument for multiple hours on the issues raised in the summary judgment motion, the *Daubert* motions, and the motions in limine. At the second conference, the court stated that it would "start writing" its decision "on the theory that the First Amendment doesn't bar [Plaintiffs'] claim," but acknowledged: "sometimes I start writing an order and it comes out the other way." Doc. 160 at 17:2-4.

Indeed, on September 22, 2021, the district court granted Defendants' summary judgment motion, ordered the dismissal of all of Plaintiffs' claims and entered judgment in Defendants' favor. Docs. 188, 189. The district court followed "[a] now well-established line of cases hold[ing] that the Lanham Act must be applied narrowly to artistic works to avoid conflict with First Amendment interests." Doc. 188 at 1-2. For one of Plaintiffs' claims—trademark dilution under Florida state law—the district court gave an alternative ground for dismissal that Plaintiffs

do not challenge: Plaintiffs failed to adduce evidence showing that their mark was famous throughout Florida. *Id.* at 23-24.

## III. Statement of the Facts

### A. Plaintiffs' Business Operations

The Flora-Bama Lounge (the "Lounge") was established in 1964 as "a small bar and package store" by the beach at the Florida-Alabama state line. Doc. 88-1 at 2. Over the years, the Lounge began offering live music and hosting events such as the "Interstate Mullet Toss," in which participants compete to throw fish across the state line. *Id.* at 3; Doc. 103-18 at 87:16-88:14.

In the late 2000s, Plaintiff MGFB Properties, Inc. underwent a Chapter 11 bankruptcy. Doc. 103-18 at 122:17-125:25. Starting in 2009, under the new majority ownership of John McInnis, the Lounge and the Flora-Bama family of establishments were expanded to include two new restaurants and a marina, all located in the vicinity of the Lounge near the Florida-Alabama state line.

In 2013, Plaintiffs obtained a federal trademark registration for "FLORA-BAMA," which covers a variety of goods and services, including bar and restaurant services, transportation services, jewelry pins, bumper stickers, beach towels, and denim jackets. It also covers "entertainment" services such as "live musical performances," "competitions for fish throwing," and "cooking contests." Doc. 1-

5

5, Ex. A.  In 2019, Plaintiffs obtained a Florida state trademark registration covering similar services.  *Id.*, Ex. D.

Under Mr. McInnis's ownership, Plaintiffs have aggressively enforced their trademark, and have sent cease-and-desist letters to at least sixty businesses in the region, sometimes at a rate of more than thirty letters per year.  Doc. 88-4 at 27:1-10; Docs. 88-5, 88-6, 88-7.  Almost all of these letters contain the same form language purporting to refute "any argument that 'Flora-Bama' is descriptive of a region rather than a brand name" and asserting that "'Flor-Ala' is the regional descriptor."  *See, e.g.*, Doc. 88-5 at 2.  Plaintiffs have sent these letters to many businesses that are nothing like Plaintiffs', including a geographic surveying company, an estate sales firm, and a dog rescue charity.  *Id.* at MGFB00043798; MGFB00043881; SC-00401.  According to Mr. McInnis, no business or nonprofit can use the word "Flora-Bama" without Plaintiffs' permission—no matter the nature of its activities—because Plaintiffs "own the name, period."  Doc. 103-27 at 69:11-17.

Plaintiffs claim to have "produced or co-produced" three films that include "Flora-Bama" as part of the title, Br. 4, each of which is a documentary about the Flora-Bama Lounge.  Doc. 103-50 at 30:9-16, 52:2-11, 55:20-56:5.  None of these documentaries has received a nationwide film release, aired on television, or been distributed on a video streaming platform.  *Id.* at 31:7-20, 53:10-55:11, 57:16-58:17.

6

Plaintiffs also claim to have licensed their trademark for use in the titles of several expressive works, including three songs, two "Live at the Flora-Bama" music recordings, and a few books about the Flora-Bama Lounge by the same author, Chris Warner. Doc. 103-100 at 17-18.

With one exception, however, there is no documentary evidence of any of these licenses. The single exception is a license agreement relating to Mr. Warner's books, which postdates those books' publication by several years and was entered into after Plaintiffs filed this action. Doc. 103-101.

Plaintiffs also claim that they "licensed their mark" for use in a television broadcast of a Kenny Chesney concert performed on the beach in front of the Lounge, Br. 49, but that assertion has no basis in the record. The agreement granting cable channel CMT a license to broadcast that program does not mention Plaintiffs. Doc. 103-27 (McInnis Dep.) at 127:8-128:19, 129:15-19.

Plaintiffs do not claim to have made any money from their film production and licensing activities. They assert only that they "received substantial promotional benefits from them." Br. 4.

## B.    Defendants' Creation of the Series

### 1.  *Initial Development*

ViacomCBS is a global media and entertainment company that operates numerous television brands, including MTV, VH1, Nickelodeon, and Comedy

Central.  495 Productions is a television production studio that contracts with content distributors, like ViacomCBS, to produce reality television series.

One such series was *Jersey Shore*, which profiled a group of fun-loving 20-somethings who lived together in a beach house in Seaside Heights, New Jersey. Doc. 103-4 at 132:3-20, 160:3-7.  *Jersey Shore* was a huge hit, thanks in large part to the distinctive "subculture" its cast was perceived as belonging to: self-identified "guidos" who share a love of clubbing and taking care of their physical appearance, but also a dedication to family and to their Italian culture.  Doc. 103-1 at 128:5-129:6; Doc. 88-11 at 56:16-57:11.  *Jersey Shore* spawned several international adaptations similarly dedicated to profiling subcultures of 20-somethings in different parts of the world, including *Warsaw Shore*, *Acapulco Shore*, and *Geordie Shore*. Doc. 103-23 at 27:7-12, 78:2-4.

In late 2016, MTV's new President, Chris McCarthy, made it a priority to bring the *Shore* franchise back to the United States.  As he wrote to the head of 495 Productions, SallyAnn Salsano, his hope was to build out a franchise similar to Bravo's *Real Housewives* franchise, with multiple series in different geographic locations: "Gulf Shore, Florida Shore, Jersey Shore, South Shore, etc."  Doc. 103-24; *see also* Doc. 103-23 (McCarthy Dep.) at 77:23-78:17.  McCarthy, Salsano, and their teams considered American beach locations that would be good candidates for featuring an appealing subculture like the one profiled in *Jersey Shore*, and

8

eventually settled on the beaches along the Gulf of Mexico.  Doc. 103-23 at 43:2-23.

MTV commissioned a survey of 300 young people familiar with the region to measure awareness and perceptions of the culture and nightlife in various beach towns, and summarized the findings in a 32-page slide deck.  Doc. 103-105 at 3. The deck uses the term "Flora-Bama" primarily in a geographic sense to refer to the beaches running from Gulf Shores to Pensacola.[1]  *Id.* at 9, 12, 18.  The slide on Gulf Shores even refers to that town as "[t]he epitome of 'Florabama' –mix of nice, relaxing Florida beaches with the down-home Southern vibe of Alabama."  *Id.* at 15. The deck also references the Flora-Bama Lounge, along with at least a dozen other nightlife destinations in the various towns profiled.  *See, e.g.*, *id.* at 10 (describing Club La Vela in Panama City Beach as "[t]he biggest club in the US"), *id.* at 15 (describing The Hangout as "[t]he go-to for people in the [Gulf Shores] area)).  The

---

[1] Internal emails referencing this research use the term in the same way.  *See, e.g.*, Doc. 103-25 at 1 (McCarthy "is having research do a deeper dive into the best locations for what he's thinking (likely will end up at Redneck Riviera/ Gulf Shore/ Flori-bama) and subcultures.").  That is true even for an email Plaintiffs selectively and misleadingly quote, *see* Br. 9, which plainly discusses potential towns in which to shoot the series.  Doc. 103-107 at 1, 6 (email from Salsano attaching and discussing a "Location Grid"; referencing "st pete," "savanah," and "biloxi"; then referencing "florabama" and asking others to "look through research and see what[']s there./Panama city/Pensacola/Gulf shores").

deck notes that the Lounge is "liked by some" but "others think it's overrated – there's usually a cop, construction, and a $20 cover." *Id.* at 14.

Survey respondents were also asked about their understanding of two terms: "Redneck Riviera" and "Flora-bama." The results are presented on a slide titled "Gulf Coast slang," which states that only "[a]bout 1/3" of respondents had heard of "Flora-bama." *Id.* at 17. Of those respondents, "[a]bout half" thought it had a geographic meaning, and "about half" (i.e. only one-sixth of the total) thought it referenced the Flora-Bama Lounge.[2] *Id.*

### 2. **Naming the Series**

The decision to name the Series *MTV Floribama Shore* was made by McCarthy, Doc. 103-23 (McCarthy Dep.) at 39:6-12, in consultation with MTV's head of unscripted television, Nina Diaz, and ViacomCBS's legal department. Doc. 103-4 at 51:10-52:10. McCarthy and Diaz testified at length about the creative process behind that decision. ViacomCBS was looking for a title, like *Jersey Shore*, that would "define[] the subculture" featured in the series: "young [S]outhern folks" who go to "shore houses" or "spend summers" on the Gulf Coast shoreline extending from Florida into Alabama. Doc. 88-11 (Diaz Dep.) at 63:14-64:1. *MTV Floribama*

---

[2] Plaintiffs quote another document as stating that "'Florabama' as a term is either unknown or though[t] to refer strictly to the bar," Br. 8, but that conclusion was based on interviews conducted with a tiny sample (only 11 people). Doc. 103-104 at 4.

*Shore* fit the bill, because "Floribama" offers "a very distinct sense of what part of the country and subculture that is." Doc. 103-23 (McCarthy Dep.) at 61:12-62:8.

Other possibilities considered by ViacomCBS did not describe the featured subculture and its connection to the *Shore* franchise as clearly. Because Florida has "multiple subcultures," a name like "Florida Shore" would not have sufficiently identified the Series' Gulf Coast setting—as opposed to Miami, for example, "which has its own sort of codes." *Id.* at 46:5-15, 61:12-62:8. The name "Gulf Shore" was seriously considered, but McCarthy and Diaz ultimately concluded that it sounded, in terms of "style" and "tone," too much like another MTV series airing at the time called *Siesta Key*. Doc. 88-17. Although *Siesta Key* was also set on the Florida Gulf Coast, it was "a very different show than what the Shore brand is." Doc. 88-11 (Diaz Dep.) at 156:15-22. To minimize viewer confusion, ViacomCBS needed a title that signaled that the new series was "a Jerseyesque type of show." *Id.* As Diaz put it in a contemporaneous email, "Floribama" "screams louder" than "Gulf Shore" and thus invokes the subculture of the Series and the *Shore* franchise more directly. Doc. 88-17.

The Series title also included ViacomCBS's famous house mark "MTV," Doc. 103-23 at 149:23-150:1, as well as the word "Shore" to tie the Series to the *Shore* franchise.

11

No executive ever testified that the Series title "didn't matter," as Plaintiffs claim. *See* Br. 10, 28, 32. The testimony Plaintiffs cite merely states that, whatever the title, the Series would have the same "organizing principle about . . . southern beach culture on the Gulf Coast." Doc. 103-1 at 278:18-279:3.

### 3. *The Series*

It is undisputed that the Series has never featured or even referenced the Flora-Bama Lounge. Rather, in the Series, "Floribama" has never referred to anything other than the area where the Series was set and that area's subculture. Indeed, to cement that meaning in viewers' minds, the Series' premiere episode displayed the Series logo on top of a map of the South, Doc. 103-4 at 115:4-12, and included voice-overs of the cast reading scripted lines such as: "That whole stretch of beach along the Gulf Coast from Alabama to Tallahassee—we call it Floribama"; and "THAT'S what it means to be from Floribama!" Doc. 103-10.

The Series logo also looks nothing like Plaintiffs'. Instead, it is modeled after the logo for *Jersey Shore*, indicating that the Series is part of the same franchise:

 



### C.    Origins of this Lawsuit

Less than a month before the Series' November 27, 2017 premiere, Plaintiffs sent ViacomCBS a cease-and-desist letter, alleging that the title of the Series infringed Plaintiffs' rights in their mark.  Doc. 103-110.  ViacomCBS promptly responded and explained its defenses, including that, under *Rogers*, "titles of artistic works are entitled to substantial deference against Lanham Act and unfair competition claims."  Doc. 88-15 at 3.

The Series premiered as scheduled, and a second season was produced and aired from July 2018 to February 2019.  On August 6, 2019—nearly two years after

their cease-and-desist letter and at a point when a third season was already scheduled to air—Plaintiffs filed this lawsuit.

## IV.    Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Grange Mut. Cas. Co. v. Slaughter*, 958 F.3d 1050, 1056 (11th Cir. 2020). Moreover, this Court may affirm the judgment "on any ground that finds support in the record." *Id.*

## SUMMARY OF THE ARGUMENT

**I.**  Unlike in a typical trademark case involving ordinary consumer products, Plaintiffs' claims target creative expression protected by the First Amendment: the title of a television series.  In such cases, this Circuit applies the "*Rogers* test," under which the use of a trademark in an expressive work is non-infringing unless the use (1) has "no artistic relevance to the underlying work whatsoever" or (2) is "explicitly mislead[ing]."  *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012).  The second prong requires the defendant to "explicitly state[]" that its work is affiliated with the plaintiff.  *Id.* at 1279.  There is no genuine factual dispute that the Series title's use of "Floribama" satisfies this test.  It is artistically relevant to the Series because it describes its geographic setting and its featured subculture, and there is no evidence of any overt statement that explicitly misleads

regarding the origin of the Series.  That is a sufficient basis to affirm the judgment below.

II.   The district court ultimately reached the correct outcome, but did so by applying a purported exception to *Rogers* for cases involving titles that are claimed to be confusingly similar to titles of other expressive works.  That exception, however, does not apply.  *First*, this is not a title-versus-title case: Plaintiffs have never alleged or sought to establish any likelihood of confusion between the Series and any *expressive work* owned or licensed by Plaintiffs.  Rather, Plaintiffs' position has always been that any alleged confusion has been between the Series and Plaintiffs' Flora-Bama-branded *commercial* enterprises.  *Second*, the purported title-versus-title exception—which arises from dicta in a footnote in *Rogers*—has no basis in law and should be rejected, as the Ninth Circuit has already done.  *See Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1197 (9th Cir. 2017).  Neither the district court nor Plaintiffs have offered any compelling reason for treating title-versus-title cases differently from other cases involving expressive works, especially given that recognizing the exception risks chilling protected speech.  Without the exception, the Series title is plainly non-infringing under *Rogers* and *University of Alabama*.

III.   In the alternative, even if this Court concludes the *Rogers* test does not apply, this Court should adopt the First Amendment balancing test used by the

15

district court, which made clear that a defendant's First Amendment rights remain paramount in a title-versus-title case. Plaintiffs must make a stronger showing of likely confusion than in an ordinary case. Further, courts should place the most weight on two objective likelihood-of-confusion factors that raise the fewest First Amendment concerns—similarity of the marks and similarity of the goods and services—and less weight on other factors that would require courts to make subjective assessments of artistic merit or intent.

IV. Under the district court's balancing test, the district court properly granted summary judgment. The two critical factors overwhelmingly favor Defendants. Apart from the geographically descriptive term "Floribama," there is no similarity at all between the Series title or logo and any title or mark used by Plaintiffs. And Plaintiffs primarily run a food, beverage, and live music business, whereas Defendants create and distribute television series. On the remaining likelihood-of-confusion factors, the district court properly concluded that Plaintiffs' evidence, even considered in the light most favorable to Plaintiffs, was insufficient to create a triable issue of fact under the heightened standard applicable to this case. Indeed, summary judgment was warranted even under the standards applicable to an ordinary trademark case.

## ARGUMENT

**I.    The *Rogers* Test Governs and Compels Affirming the Judgment Below.**

**A.    Plaintiffs' Claims Implicate Defendants' First Amendment Rights.**

This is not a trademark case involving ordinary consumer products; it is undisputed that each of Plaintiffs' claims targets expressive, creative activity protected by the First Amendment.[3]    Like any other television series, *MTV Floribama Shore* constitutes speech protected by the First Amendment.  *See Empire*, 875 F.3d at 1196 (applying *Rogers* test to trademark claims against *Empire* television series); *Dickinson v. Ryan Seacrest Enters. Inc.*, 839 F. App'x 110, 111 (9th Cir. 2020) (same for reality series *Shahs of Sunset*); *Claybrooks v. Am. Broad. Cos.,* 898 F. Supp. 2d 986, 999-1000 (M.D. Tenn. 2012) (holding that reality series *The Bachelor* is entitled to First Amendment protection).

The same is true of the Series title.  *See Empire*, 875 F.3d at 1196; *Rogers*, 875 F.2d at 998 (recognizing that "[t]he title of a movie" is "an integral element of the filmmaker's expression" and that "the expressive element of titles requires more protection than the labeling of ordinary commercial products").[4]

---

[3]  Plaintiffs do not challenge the district court's holding that Defendants' First Amendment defense applies to all eight counts alleged in their complaint.  Doc. 188 at 21-22.

[4] The district court held that the First Amendment also protects marketing materials for the Series and "the small amount of consumer products ViacomCBS has sold using the *Floribama Shore* name."  Doc. 188 at 21 (citing *Empire,* 875 F.3d at 1196-97).  Plaintiffs do not challenge that holding on appeal.

**B.     The *Rogers* Test Applies in This Circuit and Is the Appropriate Test for Trademark Claims Implicating Expressive Works.**

In *University of Alabama*, this Court considered what test should apply to trademark claims targeting a defendant's First Amendment expressive activity. Recognizing that courts must "construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark," the Court adopted the following test:

> An artistically expressive use of a trademark will not violate the Lanham Act "unless the use of the mark has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless it explicitly misleads as to the source or the content of the work."

*Univ. of Ala.*, 683 F.3d at 1278 (quoting *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008)). That two-part test is known as the *Rogers* test, after the seminal Second Circuit case *Rogers v. Grimaldi* in which it was first articulated. *See* 875 F.2d at 999.

The *Rogers* test has been overwhelmingly approved as the proper test for trademark claims targeting First Amendment activity. *See, e.g.*, *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 936-37 (6th Cir. 2003); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002). And it was recently embraced in the legislative history of the latest amendment to the Lanham Act, which states that the *Rogers* test "appropriately recognizes the primacy of constitutional protections for free expression." H.R. Rep. No. 116-645, at 20 (2020).

18

As these endorsements indicate, the *Rogers* test appropriately balances a plaintiff's trademark rights against a defendant's First Amendment rights. The "artistic relevance" prong of the test addresses the primary free-speech interest: where the defendant's use of the trademark has no artistic relevance to the underlying expression at all, there is little or no First Amendment interest to protect. *See Rogers*, 875 F.2d at 999 ("A misleading title with no artistic relevance cannot be sufficiently justified by a free expression interest."). And the "explicitly misleading" prong addresses the trademark concern with avoiding consumer confusion: where the defendant's work does not explicitly mislead as to source, sponsorship, or affiliation, there is less risk of trademark confusion. *See Mattel*, 296 F.3d at 902 (recognizing that consumers do not generally expect a work's title "to identify the publisher or producer").

Further, by replacing the typical multifactor likelihood-of-confusion test with two bright lines, the *Rogers* test promotes "the predictability of decisions," which "is of crucial importance in an area of law touching upon First Amendment values." *Ollman v. Evans*, 750 F.2d 970, 978 (D.C. Cir. 1984) (en banc); *see also Baggett v. Bullitt*, 377 U.S. 360, 372-73 (1964) (explaining that clarity is vital when a legal restriction "abut[s] upon sensitive areas of basic First Amendment freedoms"). And significantly, both bright lines are *objective*. *Rogers* does not turn on the defendant's subjective reasons for choosing a particular title. *See Empire*, 875 F.3d at 1199-

19

1200 (affirming denial of discovery into defendant's "reason for selecting the 'EMPIRE' name" and "prior knowledge of [plaintiff's] trademarks" because those issues are not "relevant to either prong of the *Rogers* test"). Rather, it asks only whether, *objectively*, there is an articulable relationship between the title and the underlying work, and whether the defendant has "explicitly stated" that the work was affiliated with the plaintiff. *Univ. of Ala.*, 683 F.3d at 1279. A subjective test, on the other hand, would risk chilling speech and encouraging self-censorship based on creators' fears of bearing the cost of intensive discovery concerning their motivations and of improper imputed intent.

### C.    Applying the *Rogers* Test Compels Affirmance.

Under *Rogers*, it is Plaintiffs' burden to prove that the Series title either has no artistic relevance to the Series or is explicitly misleading. *See VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1174 (9th Cir. 2020). Plaintiffs did not meet their burden.

To be artistically relevant, the relationship between the Series title and the Series itself "merely must be above zero." *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008). In other words, Plaintiffs can prevail under this prong of *Rogers* only by proving that the title has "no" artistic relevance to the Series "whatsoever." *Univ. of Ala.*, 683 F.3d at 1278 (quoting *E.S.S.*, 547 F.3d at 1099). Plainly, that is not the case. "Floribama" describes the subculture profiled

in the Series and the geographic area exemplified by the subculture (and where the first two seasons of the Series were set). The relationship is obvious: "Flori" refers to Florida (*i.e.*, beach culture), and "bama" refers to Alabama (*i.e.*, Southern culture).

In an effort to expand the success of the *Shore* franchise to a new geographic setting, ViacomCBS executives looked for a title that would define the subculture represented—young Southerners who rent summer "shore houses" in beach towns along the Gulf Coast. "Floribama," unlike other alternatives considered by ViacomCBS, offered "a very distinctive sense of what part of the country and subculture that is." *See supra* at 10. This consistent and unrebutted evidence establishes a relationship "above zero" between the Series and its title.

Nor can Plaintiffs show that the Series title "explicitly misleads as to the source or the content of" the Series. *Univ. of Ala.*, 683 F.3d at 1278. Use of a mark alone does not qualify as explicitly misleading. *See id.* at 1278-79. Rather, Plaintiffs must adduce evidence showing that Defendants "marketed [the Series] as endorsed or sponsored" by Plaintiffs, or "otherwise explicitly stated" that the Series was affiliated with Plaintiffs. *Id.* at 1279 (holding expressive works incorporating plaintiff's trademark not explicitly misleading absent such statements).[5] There is no

---

[5] *University of Alabama* refutes Plaintiffs' suggestion that the "explicitly misleading" prong is merely "a more exacting version of the likelihood-of-confusion test." Br. 30 (quoting footnoted dicta in *Gordon v. Drape*, 909 F.3d 257, 265 n.7 (9th Cir. 2018)). The Ninth Circuit has since reaffirmed that the "explicitly

such evidence in the record.  To the contrary, ViacomCBS chose a title that includes its own house mark (MTV) and the name of one of its most iconic franchises (*Shore*). *See supra* at 11.  Further, Defendants have never drawn any explicit connection between the Series and Plaintiffs in any marketing, advertising, or promotional materials, and the Series has never featured, discussed, or even mentioned any of Plaintiffs' establishments.

In sum, under the controlling *Rogers* test, there is no genuine factual dispute that Defendants should prevail and this Court should affirm the judgment below.

### D.    There Is No Basis to Depart from the *Rogers* Test.

Notwithstanding the foregoing, the district court declined to apply the *Rogers* test, stating that it was recognizing an "exception" for "misleading titles that are confusingly similar to other titles."  Doc. 188 at 15 (quoting *Rogers*, 875 F.2d at 999 n.5).  This Circuit has never recognized this exception to the *Rogers* test, which is dicta from a footnote in *Rogers* and was expressly rejected by the Ninth Circuit. There is no basis to depart from the *Rogers* test here, for two independent reasons. *First*, this case does not involve alleged confusion between similar titles of

---

misleading" prong "is a high bar that requires the use to be an explicit indication, overt claim, or explicit misstatement about the source of the work."  *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020) (quotation marks omitted).

expressive works.  And *second*, this Court should follow the precedent that rejects any exception to *Rogers* for title-versus-title cases.

### 1.  *This Is Not a Title-Versus-Title Case.*

The Court need not wade into the doctrinal complexities of title-versus-title cases at all, because this is not such a case.  The exception on which the district court relied applies in situations where the defendant's title is "confusingly similar to other titles," not confusingly similar to a mark as used in an ordinary commercial enterprise.  The district court itself acknowledged this principle, concluding that the exception could apply only "to the extent the defendants' title *MTV Floribama Shore* could be found misleading and confusingly similar to the plaintiffs' titles."  *Id.* at 15-16.

From the outset, Plaintiffs' claims have been premised on purported confusion with Plaintiffs' commercial *establishments*, not with any expressive works purportedly owned by Plaintiffs.  Plaintiffs' complaint did not claim rights in, or allege any confusion relating to, any expressive work.  *See* Doc. 1.  Plaintiffs' original cease-and-desist letter did not even *mention* any expressive works.  Doc. 103-110.

Likewise, on summary judgment, none of Plaintiffs' purported actual confusion evidence related to confusion between the Series and another expressive work.  *See* Br. 51-54.  Plaintiffs' survey expert expressly assessed confusion between

the Series and "the Flora-Bama Lounge"—not Plaintiffs' expressive works. Doc. 103-73 at 3. Not a single response in any survey conducted in this action has indicated any confusion with one of Plaintiffs' alleged expressive works. And none of Plaintiffs' purported evidence of Defendants' bad intent reflects any intent to create confusion with any of those expressive works. Br. 39-48. Plaintiffs' damages theory is to the same effect. Plaintiffs' expert opined that Plaintiffs were entitled to up to $51 million in corrective advertising damages to remedy the risk that Plaintiffs' "potential customers may stay away from the FLORA-BAMA entertainment venues if they are under the erroneous impression FB's venues are the home of, or otherwise affiliated with, the [Series]." Doc. 103-70 at 25.

Plaintiffs claim to have produced three documentaries about the Flora-Bama Lounge—none of which have received widespread distribution—and to have licensed their mark for use in the title of a handful of songs and books about the Lounge. These claims are not corroborated by any documentary evidence, except for one book license that postdates the relevant books' publication by several years. *See supra* at 7. But even accepting Plaintiffs' claims, ultimately, Plaintiffs' business is food, drink, and live entertainment. The revenue Plaintiffs derive from expressive works is, at best, negligible; indeed, Plaintiffs claim only to have "received substantial promotional benefits from them." Br. 4. Under these circumstances, applying a title-versus-title exception to *Rogers* allows the tail to wag the dog.

24

If Plaintiffs are right, businesses of all types could easily insulate themselves from *Rogers* simply by releasing (or licensing their marks to) a book or song. The Coca-Cola Company, for example, could commission a "History of Coca-Cola" pamphlet and distribute it for free at the giftshop at World of Coca-Cola, and that would be sufficient to defeat a *Rogers* defense in any trademark case brought by Coca-Cola—whether or not the defendant's work references the pamphlet in any way or is even alleged to create confusion with the pamphlet as opposed to Coca-Cola's commercial goods. Such an exception would swallow the *Rogers* rule and the First Amendment interests *Rogers* and its progeny universally protect.

### 2.   *This Court Should Decline to Recognize a Title-Versus-Title Exception to* Rogers.

In any event, the purported title-versus-title exception is unfounded and this Court should join the Ninth Circuit in rejecting its validity. *See Empire*, 875 F.3d at 1197 (explaining that the exception is "ill-advised or unnecessary").

Indeed, if this Court applied the exception, it would be the first circuit court to do so. *Rogers* itself was not a title-versus-title case and thus the footnote describing the exception was dicta. The *Rogers* footnote simply asserted that "[t]he public interest in sparing consumers . . . confusion [between titles] outweighs the slight public interest in permitting authors to use such titles." 875 F.2d at 999 n.5. For several reasons, the Court should not transform that passing out-of-circuit dictum into binding circuit precedent and create a circuit split with the Ninth Circuit.

25

*First*, to the extent the *Rogers* footnote rested on an intuition that trademark confusion is more likely between titles than between a title and an ordinary trademark, that intuition is wrong.  There is no risk of trademark confusion unique to title-versus-title disputes warranting an exception that waters down First Amendment protections for expressive activity.  "Consumers expect a title to communicate a message about the book or movie, [not] to identify the publisher or producer."  *Mattel*, 296 F.3d at 902; *see also Rogers*, 875 F.2d at 1000 ("Though consumers frequently look to the title of a work to determine what it is about, they do not regard titles of artistic works in the same way as the names of ordinary commercial products.").  Consumers thus understand that it is common for two expressive works to have similar titles and that this does not mean they were created by the same people.  *See Empire*, 875 F.3d at 1196 ("[C]onsumers are less likely to mistake the use of someone else's mark in an expressive work for a sign of association, authorship, or endorsement.").  Few people would believe the 1984 Mel Gibson movie *The River* has anything to do with the Bruce Springsteen song "The River" simply because they share a title.  The same goes for Taylor Swift's 2008 hit "Love Story" and the classic 1970 movie *Love Story* (even though its famous musical theme was later released under the name "(Where Do I Begin?) Love Story").

For this very reason, trademark confusion in the title-versus-title context is unlikely to arise unless the defendant's title is explicitly misleading under the second prong of the *Rogers* test. An artistic work simply titled *The River* likely will not cause confusion with Bruce Springsteen's song, but a work titled *Bruce Springsteen's The River Keeps Flowing* might. The "explicitly misleading" prong of the *Rogers* test already addresses that possibility. *See id.* (the title-versus-title exception "has the potential to duplicate . . . the second prong of *Rogers*").

*Second*, the title-versus-title exception risks chilling constitutionally protected speech—an outcome that is no less antithetical to the First Amendment in the title-versus-title context than in any other context. The *Rogers* test recognizes creators' free speech interest in choosing a creatively fitting title for their work. That interest is the same whether or not another expressive work with a similar title happens to exist. Without *Rogers*, creators of expressive works would be forced to guess how a court or a jury would balance the many factors in the fact-intensive likelihood-of-confusion test against the creator's free speech rights. Faced with that uncertainty and the threat of litigation, speakers likely would self-censor to avoid controversy. The First Amendment does not allow that outcome. *See Baggett*, 377 U.S. at 372-73; *Ollman*, 750 F.2d at 978.

*Finally*, neither the district court nor Plaintiffs have offered any substantive reason not to follow the Ninth Circuit's *Empire* decision rejecting *Rogers*'s title-

versus-title footnote. In "adopt[ing]" the footnote and "reject[ing]" *Empire*, the district court stated that it was following a post-*Rogers* Second Circuit decision, *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490 (2d Cir. 1989), which this Court "cited with approval in *University of Alabama*." Doc. 188 at 14. But this Court cited *Cliffs Notes* for the proposition that "the *Rogers* test [is] 'generally applicable to Lanham Act claims against works of artistic expression.'" *Univ. of Ala.*, 683 F.3d at 1277 (quoting *Cliffs Notes*, 886 F.2d at 495). This Court did not mention, much less endorse, the title-versus-title exception. The district court also criticized *Empire*'s description of *Cliff Notes* as applying the *Rogers* test, whereas (according to the district court) *Cliffs Notes* only "applied the *Rogers* animating principle." Doc. 188 at 14. But even if true, that has no bearing on whether *Empire* reached the right outcome.

Meanwhile, Plaintiffs simply quote the unpersuasive reasoning of the *Rogers* footnote itself. *See* Br. 23. Plaintiffs devote so little effort to justifying the existence of a title-versus-title exception that they do not even inform the Court that, if adopted, their position would create a circuit split.

*** 

In sum, the judgment should be affirmed because the Series title satisfies the *Rogers* two-prong test adopted in *University of Alabama*. This is not a title-versus-title case; the record includes no evidence whatsoever of any likelihood of confusion

28

between the Series title and the title of any of Plaintiffs' purported expressive works. Accordingly, the Court need not even address the *Rogers* footnote. But in any event, a title-versus-title exception to *Rogers* is unjustified and risks chilling protected speech. The Series title is indisputably artistically relevant to the Series and not explicitly misleading; that is sufficient to defeat Plaintiffs' claims.

## II.     The Judgment Should Be Affirmed Even if the *Rogers* Test Does Not Apply.

Although the district court declined to apply the *Rogers* test, it nevertheless held that Defendants were entitled to summary judgment "because the plaintiffs' showing of likelihood of confusion . . . is not strong enough to meet the standard that applies to artistic works." Doc. 188 at 2. In that respect, the district court was correct and should be affirmed on that alternative basis.

### A.     Even Title-Versus-Title Cases Require First Amendment Balancing.

The district court properly recognized that, even in title-versus-title cases, "the First Amendment remains relevant: a court still must balance the interest in trademark protection against the interest in free expression." *Id.* at 15. Certainly, a creator's First Amendment interest in using a particular title does not vanish simply because another expressive work with an arguably similar title already happens to exist. *See supra* at 27.

29

Plaintiffs take the contrary view that in title-versus-title cases, the First Amendment does not come into play at all, and courts should simply apply the likelihood-of-confusion factors as they would in any run-of-the-mill trademark case. Br. 22-25. For the reasons explained above, that is wrong. Indeed, no circuit court has ever embraced that view; even in the Second Circuit, a First Amendment balancing approach is "generally applicable to Lanham Act claims against works of artistic expression." *Cliffs Notes*, 886 F.2d at 495; *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1991) (in title-versus-title case, "the finding of likelihood of confusion must be particularly compelling to outweigh the [defendant's] First Amendment interest").[6]

Instead, Plaintiffs urge the Court to follow three outlier district court cases. *See* Br. 24-25 (citing *Legacy Ent. Grp., LLC v. Endemol USA Inc.*, 2015 WL 12838795 (M.D. Fla. Oct. 1, 2015), *Apollo Theater Found., Inc. v. W. Int'l Syndication*, 2005 WL 1041141 (S.D.N.Y. May 5, 2005), and *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 749 F. Supp. 1243 (S.D.N.Y. 1990)). But none offers a persuasive reason to disregard the First Amendment—indeed, none has ***ever*** been

---

[6] Plaintiffs' attempts to minimize *Twin Peaks* are unpersuasive. *See* Br. 28-30. *Twin Peaks* (unlike the *Rogers* footnote, which was dicta) is binding precedent in the Second Circuit. *See, e.g.*, *Syler v. Woodruff*, 610 F. Supp. 256, 267 (S.D.N.Y. 2009); *Lemme v. Nat'l Broad. Co.*, 472 F. Supp. 433, 446 (E.D.N.Y. 2007); *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 296 (S.D.N.Y. 1997).

cited by a court for the proposition Plaintiffs advocate here.[7]  *Tri-Star Pictures* was

decided before *Twin Peaks* clarified the test applicable to title-versus-title cases and

is thus no longer good law.  Similarly, *Apollo Theater* simply applied the *Rogers*

footnote in three short paragraphs, without acknowledging the developments in

Second Circuit law made by *Cliffs Notes* and *Twin Peaks*.  *See* 2005 WL 1041141,

at *15.  Finally, in holding that *Rogers* does not apply in title-versus-title cases,

*Legacy* relied on just three other cases, *see* 2015 WL 12838795, at *6, none of which

involved *any* expressive work, let alone multiple competing expressive works.[8]

Plaintiffs offer several justifications for their unprecedented position that

Defendants' First Amendment interests should be given *zero* weight.  Each of

Plaintiffs' justifications is unpersuasive and highlights how Plaintiffs' position

would undermine foundational First Amendment principles.

---

[7] One court even cited *Tri-Star Pictures* in *support* of recognizing the "First Amendment concerns" raised by trademark claims involving titles.  *Experience Hendrix, L.L.C. v. HendrixLicensing.com, LTD*, 766 F. Supp. 2d 1122, 1148 (S.D.N.Y. 2011).

[8] *See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931 (11th Cir. 2010) (competing car dealership advertisements); *Conagra, Inc. v. Singleton*, 743 F.2d 1508 (11th Cir. 1984) (competing business names); *Marco's Franchising, LLC v. Marco's Italian Exp., Inc.*, 2007 WL 2028845 (M.D. Fla. July 9, 2007) (competing restaurant names).  Unsurprisingly, none of these cases mention *Rogers* or the First Amendment.  They stand only for the proposition that in the *absence* of any First Amendment interest associated with the alleged use of a mark, the traditional likelihood-of-confusion test applies.

*First*, Plaintiffs assert that applying any heightened confusion standard here "wrongly elevate[s]" Defendants' First Amendment rights over Plaintiffs'. Br. 36. But Plaintiffs' First Amendment rights are not at issue; whatever the outcome of this case, Plaintiffs can continue to use the mark "FLORA-BAMA" and can license it as they see fit. By contrast, Plaintiffs' claims expressly seek to limit Defendants' constitutionally protected expressive activity.

*Second*, Plaintiffs propose that titles of expressive works should receive First Amendment protection only when it is *necessary* to use that particular title. Br. 30-36. But in *Rogers* itself, the court rejected that "'no alternative' standard," explaining that it "provides insufficient leeway for literary expression." 875 F.2d at 999.

Further, a "need" test is unworkable because it requires courts to determine to what extent a work's artistic merit, and the artist's creative goals, would be impaired if the work was modified to remove the plaintiff's trademark. In *University of Alabama*, a court applying a "need" test would have had to decide, in effect, whether the defendant could have satisfied himself with a lesser degree of realism (for example, by painting the football players shirtless or using a more impressionistic technique that blurred the trademarks at issue).[9] Courts are not qualified to make

---

[9] Even taking the goal of realistic depiction as a given, courts will be confronted with these questions. Take, for example, an artist who paints a realistic depiction of a

determinations of artistic merit; there is no legal standard to do so. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.").

Finally, a "need" test is ill-fitted to titles, because it is generally impossible to demonstrate that any particular title is strictly necessary to an expressive work and that another title could not have been used instead. A "need" test would remove almost all First Amendment protection from the use of trademarks in artistic titles, gutting *Rogers* itself.

The facts of this case perfectly illustrate the shortcomings of a "need" test. As described above, ViacomCBS considered other options for the Series title, such as "Florida Shore" and "Gulf Shore," but found that "Florida Shore" was unsuitable because Florida has "multiple subcultures," while "Floribama" "screams louder" than "Gulf Shore." *Supra* at 11. Plaintiffs apparently ask this Court to reject that artistic judgment and hold "Gulf Shore" screams just as loudly as "Floribama." This Court is neither competent, nor authorized, to conduct that assessment.

---

real thousand-person crowd in which one person is holding a can of Coca-Cola. Does realism require the painter to show the Coca-Cola logo on the can?

*Fourth*, as a variation on the "need" test, Plaintiffs suggest that the use of a trademark in an expressive work is protected only if the trademark is used to refer to the mark's owner, as in a parody or a commentary.  Br. 32.  But that referential requirement has also been repeatedly rejected.  *See Empire*, 875 F.3d at 1198-99 (holding that referential requirement would be "inconsistent with" *Rogers*); *E.S.S.*, 547 F.3d at 1100 (use of plaintiff's mark in video game was protected even though game was not "about" plaintiff); *Jackson v. Netflix, Inc.*, 506 F. Supp. 3d 1007, 1015 (C.D. Cal. 2020) (similar).[10]

Further, a referential requirement leads to absurd results, particularly for terms, like "Floribama," that are susceptible to meanings unrelated to the mark's owner.  It means, for example, that the author of an *Encyclopedia of Apple Varieties* would have no First Amendment defense to a trademark claim brought by Apple

---

[10] Plaintiffs cite two district court cases in support of a referential requirement, *Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883 (N.D. Cal. 2010) and *Warner Bros. Ent. v. Global Asylum, Inc.*, 2013 WL 12114836 (C.D. Cal. Jan. 29, 2013), but neither remains good law after the Ninth Circuit's decision in *Empire*.  *See IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1193 n.10 (D. Ariz. 2019) (explaining that *Rebelution*'s and *Global Asylum*'s approach "has been rejected"); *Twentieth Century Fox Television v. Empire Distrib. Inc.*, 161 F. Supp. 3d 902, 907-08 (C.D. Cal. 2016) (collecting cases in which *Rebelution* and *Global Asylum*'s referential requirement is "criticized for misapplying the *Rogers* test").  Plaintiffs mistakenly attempt to analogize this case to *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003), but in *Parks*, the court found that there was a genuine factual issue whether the title of the defendants' song was artistically relevant *at all*, under the first prong of the *Rogers* test, *id.* at 458.  Here, no reasonable jury could find that the Series title has no artistic relevance.  *See supra* at 20-21.

Inc.—because "apple" in the title does not refer to that technology company. Just as Apple Inc. cannot stop authors from using "apple" to refer to fruits, Plaintiffs cannot stop others from using "Floribama" as a portmanteau of "Florida" and "Alabama" rather than to refer to Plaintiffs.

Nor would it make a difference if, as Plaintiffs misleadingly argue, Defendants used "Floribama" to refer to "something that they made up." Br. 35. Even if that were true, *but see infra* at 45, making things up is at the heart of creative expression. In *Empire*, for example, the accused television show also used the trademark at issue ("Empire") to refer to something that was "made up": a fictional record label. 875 F.3d at 1195. The First Amendment protects Defendants' use of "Floribama" to refer to the area where the Series was filmed and to the beach subculture exemplified by that area, whether the subculture preexisted the Series or was the product of Defendants' creative efforts.

*Fifth*, and finally, Plaintiffs urge the Court to adopt an intent-based test and accuse Defendants of "admitting that they copied 'Flora-Bama' for the name of their show." Br. 35. Defendants admit no such thing. *See infra* at 47-52. But regardless, an intent test is inconsistent with the predictability and objectivity required by the First Amendment. *See Baggett*, 377 U.S. at 372-73; *Ollman*, 750 F.2d at 978. In *Empire*, the Ninth Circuit affirmed the denial of discovery into the defendant's "reason for selecting" the title at issue, finding it irrelevant under *Rogers*. 875 F.3d

35

at 1199-1200.  And the Lanham Act legislative history cited above advises courts not to replace *Rogers* with a test "that might require a court to engage in fact-intensive inquiries and pass judgment on a creator's 'artistic motives.'"  H.R. Rep. No. 116-645, at 20 (2020).  Courts are not qualified to pass on artistic merit, *see Bleistein*, 188 U.S. at 251, and likewise they are ill-equipped to judge whether artistic decisions were well founded.  *See Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 41-42 (2d Cir. 2021) (courts "should not assume the role of art critic and seek to ascertain the intent behind" expressive works).  A test in which a creator's ability to use a title turns on their perceived intent leaves creators at the mercy of a court or a jury failing to understand their artistic motivations, not to mention the burdens and intrusions of litigation around their artistic process.  The result will be self-censorship and chilling of protected speech.  *See supra* at 19-20.

## B.    The District Court's Balancing Test Is the Next-Best Alternative to the *Rogers* Test.

If this Court declines to apply *Rogers*, it should adopt the test used by the district court, which is a next-best alternative.  The district court applied a balancing test derived from the Second Circuit's decisions in *Cliffs Notes* and *Twin Peaks*.  To account for Defendants' First Amendment interests, that test modifies the standard likelihood-of-confusion test in two ways: it raises Plaintiffs' burden of proof and reweights the likelihood-of-confusion factors.  Summary judgment was properly

granted under that test; indeed, either modification standing alone is sufficient to affirm the judgment.

*First*, the district court held that in a title-versus-title case, "the finding of likelihood of confusion must be *particularly compelling* to outweigh" Defendants' First Amendment interests.  Doc. 188 at 12 (quoting *Twin Peaks*, 996 F.2d at 1379) (emphasis added).  This appropriately implements this Court's recognition that, when an expressive work is involved, some risk of confusion must be tolerated.  *See Univ. of Ala.*, 683 F.3d at 1277, 1282.

Practically, the "particularly compelling" standard raised the "quantum and quality" of evidence Plaintiffs had to present to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  In *Anderson*, the Supreme Court held that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id.*  Thus, where an element of a claim must be proven by "clear and convincing" evidence, the proper inquiry on summary judgment is whether the record contains evidence of a sufficient "caliber or quantity to allow a rational finder of fact to find [that element] by clear and convincing evidence."  *Id.*  Here, similarly, it was not enough for Plaintiffs to present evidence from which a reasonable jury could find a likelihood of confusion under the traditional balancing test by a

preponderance of the evidence.  Instead, Plaintiffs had to present evidence that a jury could reasonably find "particularly compelling."

*Second*, the district court held that, "[i]n weighing the First Amendment interest, a critical factor is the substantial disparity in how the plaintiffs and defendants use their marks," Doc. 188 at 19, and then highlighted the parties' dissimilar businesses ("the sale of food and drink" vs. "a nationally broadcast television series") and to the two marks' "entirely dissimilar" "graphic displays," *id.* at 20.  In effect, the district court placed special emphasis on the second and third factors—**similarity of the goods and services** and **similarity of the marks**—in this Circuit's likelihood-of-confusion test, and less weight on the five other factors.  *See Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016) (listing the likelihood-of-confusion factors).

The district court's approach is consistent with the case law the district court applied.  *See Twin Peaks*, 996 F.2d at 1379-80 (explaining that "the wording and appearance of the title" are a "special consideration").  Replacing the seven-factor likelihood-of-confusion test with a test that treats only two factors as critical provides some of the predictability the First Amendment requires and that *Rogers* provided, while reducing the impact of the factors most likely to raise First Amendment concerns.  Moreover, as in *Rogers*, the two critical factors are

38

objective—they examine the way the parties' marks or titles are displayed in commerce and the businesses in connection with which they are used.

Three other likelihood-of-confusion factors, by contrast, require inquiries antithetical to the First Amendment, making them worthy of only minimal weight in a case involving an expressive work:

- **Strength of the plaintiff's mark**: in a purported title-versus-title case, this factor should logically turn on the "strength" of the *title* of the plaintiff's work, not the strength of the plaintiff's mark. But expressive titles do not fit neatly on the fanciful-to-generic spectrum used to assess trademark strength. *See, e.g.*, *Univ. of Ala.*, 683 F.3d at 1271 n.6 (describing spectrum). There is thus a risk that the strength-of-the-title inquiry will improperly devolve into a subjective assessment of the title's artistic merit. *See Bleistein*, 188 U.S. at 251.

- **The defendant's intent**: as explained above, a test focusing on a defendant's intent risks chilling speech by making liability dependent on courts' subjective assessments of creators' artistic motivations. *See supra* at 35-36.[11]

- **Actual confusion**: in cases involving expressive works, this factor necessarily bears less weight, because some risk of confusion must be tolerated in the interest of promoting free expression. *Univ. of Ala.*, 683 F.3d at 1277, 1282. In *Rogers*, for example, the court held that the plaintiff's survey and anecdotal evidence of confusion did not raise a genuine factual issue for trial, because the confusion they demonstrated was "outweighed by the danger that suppressing an artistically relevant

---

[11] Even in a run-of-the-mill trademark case, this Court has never held that intent is "one of the two most important factors," as Plaintiffs claim. *See* Br. 39-40. In such a case (although not in a case involving the First Amendment), "the type of mark and the evidence of actual confusion are the most important." *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1281 (11th Cir. 2020) (quoting *Fla. Int'l Univ.*, 830 F.3d at 1255).

though ambiguous title will unduly restrict expression."  875 F.2d at 1001.

Finally, the two remaining factors—**similarity of the parties' trade channels, customers, and advertising media**—are rarely decisive to the likelihood-of-confusion analysis and little turns on the weight given to them.  But giving them less weight enhances the test's predictability and thus mitigates the potential chilling effect of a multifactor balancing test.

## C.    Summary Judgment Was Warranted Under the District Court's Test.

Under the district court's balancing test, the judgment should be affirmed. The two critical likelihood-of-confusion factors clearly favor Defendants, while the "intent" and "actual confusion" factors on which Plaintiffs focus carry less weight in a case involving an expressive work.  And in any event, Plaintiffs' evidence on the likelihood-of-confusion factors, however they are weighted, is insufficient as a matter of law to meet *Twin Peaks*' "particularly compelling" standard.

### 1.    *The District Court Did Not Conduct Improper Fact-Finding.*

As a threshold matter, the district court did not err in its approach to analyzing the likelihood-of-confusion factors at summary judgment.  Contrary to Plaintiffs' contention, the district court did not engage in impermissible fact-finding.  Instead, it merely assessed the evidence on all seven factors so as to make a holistic determination whether a reasonable jury could find a likelihood of confusion.  This

40

Court has frequently conducted the same analysis of the seven factors and affirmed a grant of summary judgment. *See, e.g.*, *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1288 (11th Cir. 2020); *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (affirming summary judgment even though certain factors favored nonmovant); *Tana v. Dantanna's*, 611 F.3d 767, 782 (11th Cir. 2010) (same). The district court permissibly followed the same methodology.

### 2. *The Two Critical Factors Favor Defendants.*

**Similarity of the Marks (Factor 2).** Plaintiffs do not challenge the district court's determination that this factor strongly favors Defendants. The district court noted that Plaintiffs and Defendants spell "Floribama" differently; that Defendants "always add 'Shore' after 'Floribama'" and "usually insert 'MTV' before 'Floribama'"; and that the "graphic displays of the two marks are entirely dissimilar." Doc. 188 at 17, 20. It emphasized that the Series has "never depicted or even referred to" the Flora-Bama Lounge. *Id.* at 20.

The only similarity between Plaintiffs' titles and the Series title is the single word "Floribama," which is a geographically descriptive portmanteau of "Florida" and "Alabama." When their only common element is a descriptive term, marks are considered dissimilar, because consumers are less likely to perceive the common element as a source-identifier. *See, e.g.*, *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d

827, 830 (8th Cir. 1999) (affirming summary judgment to defendant where common element was descriptive); *Pilot Corp. of Am. v. Fisher-Price, Inc.*, 501 F. Supp. 2d 292, 304-05 (D. Conn. 2007) (similar); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:48 ("McCarthy") ("If the common element in the conflicting marks is suggestive or descriptive of the goods or services, this lessens the likelihood of confusion.").

**Similarity of the Goods and Services (Factor 3).** This factor weighs strongly in Defendants' favor: "An oyster bar, lounge, and concert venue, even with an occasional festival or song or show, is nothing like a national television series." Doc. 188 at 17; *see also id.* at 20.

Plaintiffs cannot salvage this clear dissimilarity by appealing to the "natural expansion" doctrine. *See* Br. 49-50. To begin with, Plaintiffs waived this argument by not raising it in the district court. *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009). But in any event, the "natural expansion" doctrine simply extends trademark rights to products "*which would reasonably be thought by the buying public* to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1201 (11th Cir. 2001) (emphasis added). Thus, whether the Flora-Bama Lounge was solicited as a setting for a television show or location to hold a casting call is beside the point. What matters is whether consumers with no knowledge of

these behind-the-scenes dealings would reasonably believe that Plaintiffs suddenly expanded into reality television production.  There is no evidence that this is true.

Plaintiffs' reliance on *Viacom International v. LJR Capital Investments, L.L.C.*, 891 F.3d 178 (5th Cir. 2018), is misplaced.  In that case, the defendant planned to open a restaurant with the same name—"The Krusty Krab"—as the fictional restaurant in Viacom's animated series *SpongeBob SquarePants*.  *Id.* at 182. In holding that the "similarity of the products and services" factor favored Viacom, the court noted that "both marks already identify restaurants."  *Id.* at 194.  It also cited caselaw "recogniz[ing] the logical extension of fictional characters to restaurants," and noted that Viacom's own subsidiary had previously "licensed Bubba Gump Shrimp Co., a fictional business in the movie 'Forrest Gump,' to create a chain of real seafood restaurants."  *Id.*  Here, "Flora-Bama" has never been the name of a television series; Plaintiffs have consistently rejected all offers to make their establishments the focus of a television series, Doc. 103-27 at 242:19-244:20, 247:17-251:21, 255:1-256:13; and Plaintiffs have offered no examples of bars or live music venues that expanded into the reality television business.

\*\*\*

The two critical likelihood-of-confusion factors overwhelmingly favor Defendants and that is a sufficient basis to affirm the district court.

43

### 3.  *The Remaining Factors Also Favor Defendants.*

The district court appropriately gave the remaining five factors less weight. In any event, they all favor Defendants.

**Strength of the Mark (Factor 1).**  Because the sole reason the district court even reached this factor was its (incorrect) characterization of this case as a title-versus-title case, it should have focused on the strength of the *titles* of Plaintiffs' works (not the strength of their *mark*)—a factor on which Plaintiffs submitted zero evidence.  The district court's analysis of this factor was thus flawed.

To the extent the strength of Plaintiffs' mark is relevant, the factor favors Defendants.    The district court correctly recognized that "Flora-Bama" is "geographically descriptive—a portmanteau of the names of the two states on whose border the plaintiffs' establishment sits."  Doc. 188 at 16.  "Geographically descriptive terms are placed in the same category as terms that are descriptive of some quality or feature of goods."  McCarthy § 14:1.  The weakness of Plaintiffs' mark is underscored by its extensive use by third parties in the region.  Doc. 88-20 (Alabama Secretary of State records); Doc. 88-21 (Florida Department of State records); *see Fla. Int'l Univ.*, 830 F.3d at 1257 ("the extent of third-party use of a mark is an essential factor in determining a mark's strength").  And its commercial weakness was conceded by Plaintiffs' marketing expert, who agreed that only 1-2%

of the national population have ever heard of Plaintiffs.  Doc. 103-75 at 276:19-277:1.

The district court, however, improperly discounted this evidence, stating that the term "Flora-Bama" was "apparently" created specifically to refer to the Flora-Bama Lounge.  Doc. 188 at 16.  But there is no record evidence that Plaintiffs' predecessors were the first to use that term.[12]  Indeed, Plaintiffs' summary judgment papers below did not even make that claim.  In any event, the strength of a mark does not turn on whether it was created by the trademark owner but on where it sits on the distinctiveness spectrum.  "Apple" is an arbitrary, and thus strong, mark for computers even though the word "apple" has a long history.  Conversely, "Investacorp" is a descriptive, and thus weak, mark for an investment firm, *see Investacorp, Inc. v. Arabian Investment Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1524 (11th Cir. 1991), regardless of whether the firm invented the term.

The district court also mistakenly stated that, before the Series premiere and "[f]or most of those familiar with the term," "Flora-Bama" referred to the Flora-Bama Lounge and nothing else.  Doc. 188 at 16-17.  That is flatly contradicted by

---

[12] Publicly available information suggests otherwise.  The Google Books Ngram Viewer, for example, reflects usage of "Floribama" in the 1920s and 1930s, well before the Lounge was established.  *See* https://tinyurl.com/mrxt2fu3.

the record.[13]  In a survey by Plaintiffs' own expert, 7% of respondents used the term—*unprompted*—to refer to a geographic area.  Doc. 103-73 at 47.  And a 300-person survey commissioned by ViacomCBS before the Series was developed showed that half of respondents familiar with the term thought it had a geographic meaning.  *See supra* at 9-10.

**Similarity of Trade Channels, Customers, and Advertising Media (Factors 4 and 5).**  The district court correctly held that these factors favor Defendants.  With respect to trade channels, Plaintiffs provide services primarily in physical establishments in a single location, whereas the Series is available on cable television and through streaming and download-to-own platforms.  The fact that Plaintiffs generated a small portion of their revenue "online," *see* Br. 50, does not move the needle.[14]  *Kibler v. Hall*, 843 F.3d 1068, 1080 (6th Cir. 2016) (overlapping use of Twitter and Facebook irrelevant); *Parfums De Coeur, Ltd. v. Lazarus*, 83 U.S.P.Q.2d 1012 (T.T.A.B. 2007) ("virtually everything is advertised and sold

---

[13] And, again, by publicly available information.  *Miami Herald* columnist Al Burt used "Floribama" to refer to the Florida panhandle at least as early as 1983.  *See supra* at 2.  And as early as 2012, the website Wiktionary defined "Florabama" as "The region of Florida that can be said to be part of the Deep South."  *See* https://en.wiktionary.org/w/index.php?title=Florabama&oldid=16985471.

[14] $3 million between 2018 and 2020 ($1 million per year) represents less than 2% of Plaintiffs' revenue.  Doc. 91-5 at 4.

through the Internet"). There is no evidence that the parties have ever sold goods or services through the same website or online platform.

The parties' customer bases also differ. Plaintiffs' is local and the Series' is national. *Compare* Doc. 88-24 (Plaintiffs' Facebook data showing a predominantly local following) *with* Doc. 88-25 at VIA00017395 (ViacomCBS' Nielsen data showing predominantly national audience). Further, 54% of Plaintiffs' Facebook followers are over 45, Doc. 88-24; Doc. 103-50 at 113:18-115:2, whereas (in 2020) only 7.7% of the Series' Facebook audience was, Doc. 88-27 at 3; Doc. 103-4 at 285:16-286:20. Plaintiffs' own survey confirmed that lack of overlap: it determined that only 13% of people familiar with the Flora-Bama Lounge have ever watched the Series, and even fewer (6%) have watched more than once or twice. Doc. 103-73 at 44.

Finally, Plaintiffs do not challenge the district court's holding that the "similarity of advertising media" factor favors Defendants, which is amply supported. Plaintiffs do not spend any of their marketing budget on national outlets. Doc. 103-50 at 160:16-161:8. Instead, they advertise primarily in local print publications for seasonal tourists, on local radio stations, and, since 2018, on one local television channel. Doc. 88-30 at 5-7; Doc. 88-31 at 1, 7; Doc. 88-32 at 124:8-20. There is no evidence that ViacomCBS ever advertised the Series in any publication or on any channel used by Plaintiffs. Again, the fact that the parties both

47

advertise on Google and social media, without more, is not probative of confusion. *Hard Rock Café Int'l USA, Inc. v. RockStar Hotels, Inc.*, 2018 WL 7825183, at *14 (S.D. Fla. June 13, 2018).

**Defendants' Intent (Factor 6).**  Regardless of the weight given, this factor favors Defendants.  "Floribama" is indisputably a portmanteau of "Florida" and "Alabama," and *MTV Floribama Shore* describes the geographic setting and featured cast subculture of the Series in the same way that *Jersey Shore* did for that series.[15]  The district court also correctly recognized that Plaintiffs' account of Defendants' motivation makes no sense.  Why would ViacomCBS's choice of title for a major new series be driven by a desire to appropriate the goodwill of a mark known to only 1-2% of the national population, and which Plaintiffs now concede is not even famous in Florida?  *See Tana*, 611 F.3d at 779 (on appeal from grant of summary judgment, no improper motive could be shown where plaintiff's mark had no secondary meaning in defendant's market and where parties did not compete).

Plaintiffs' arguments to the contrary misstate the law and mischaracterize the evidence.  The case on which Plaintiffs primarily rely, *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778 (11th Cir. 2020), is inapposite.  That was a trade dress case involving product packaging for competing brands of adhesive—not the title of an

---

[15] Plaintiffs' argument that *Facebook Shore* also fits the pattern is absurd.  *See* Br. 46.  "Facebook" is not even arguably a geographic term.

expressive work using a word mark with a geographic meaning.  Moreover, in *J-B Weld*, the defendant's team responsible for designing the accused packaging wrote emails stating that they intended to "successfully mirror [the plaintiff] at shelf," and even called their design a "knock off."  978 F.3d at 791-92.  Plaintiffs' intent evidence here does not come close.  None of it relates to any person who had a role in naming the Series.  None of it states any intention to appropriate Plaintiffs' mark (or titles).  Plaintiffs rely exclusively on sporadic references to the Flora-Bama Lounge among dozens of other Gulf Coast nightlife venues.  That does not raise a genuine factual issue under any standard of proof.

It is well established that Defendants' mere awareness of Plaintiffs' mark and registration is not evidence of bad intent.  *Off Lease Only, Inc. v. Lakeland Motors, LLC*, 825 F. App'x 722, 730 (11th Cir. 2020) ("Mere knowledge of another's mark does not create an inference of intent to misappropriate."); McCarthy § 23:115 ("[M]ere knowledge or awareness of the senior user's mark is not the same as an intent to confuse customers.").[16]  Nor is Defendants' refusal to change the Series title after receiving Plaintiffs' cease-and-desist letter.  McCarthy § 23:120; *see also PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019)

---

[16] Plaintiffs cite *Custom Manufacturing & Engineering, Inc. v. Midway Services, Inc.*, 508 F.3d 641 (11th Cir. 2007) for the opposite proposition, but that opinion did not apply the likelihood-of-confusion factors.

(defendant's continued use of mark after being served with complaint did not establish willfulness for damages purposes).

Plaintiffs' evidence that 495 Productions (*not* ViacomCBS) sporadically reached out to Plaintiffs (among dozens of other venues) over the years also lacks probative value. It is undisputed that 495 Productions had no role in naming the Series. Doc. 103-4 at 51:10-52:10; Doc. 88-50 at 46:9-47:1. Further, the fact that 495 Productions may occasionally have considered the Flora-Bama Lounge as a potential filming *location* does not raise the inference that it had any interest in using Plaintiffs' mark for a series that was *not* filmed there.[17] Equally uncompelling is Plaintiffs' selective quotation from an email in which the head of 495 Productions recognizes that 495 Productions "have been to [the Lounge] before." *See* Br. 9, 43-44 (citing Doc. 103-107). Unlike the incriminating emails in *J-B Weld*, that email: (1) says nothing about copying, (2) was written by someone who had no role in naming the Series, Doc. 88-50 at 46:9-47:1, and (3) was not about naming the Series but plainly about choosing the Series' geographic location. *See supra* note 1.

---

[17] When a 495 Productions employee reached out to Plaintiffs in January 2017, it was about a potential "workplace docu-series along the lines of Vanderpump Rules where we can highlight a Southern 'hotspot' and follow the people who work there." Doc. 103-62. That plainly was not *MTV Floribama Shore*, which (like the other *Shore* shows) follows a group of young people *living* together in a beach house.

For contemporaneous evidence of *ViacomCBS*'s intent, Plaintiffs rely exclusively on the slide deck created by ViacomCBS's research department. But the deck shows that ViacomCBS understood "Flora-Bama" to have a geographic meaning, and the stray references to the Flora-Bama Lounge establish only that certain ViacomCBS employees were aware of it as one of several prominent Gulf Coast nightlife destinations—one that was sometimes considered "overrated." *See supra* at 9.

Plaintiffs thus fall back on documents that postdate the naming of the Series by several months. But these also prove nothing. That Defendants had cast members read scripted lines elaborating on the geographic meaning of "Floribama" for the Series premiere simply underscores their lack of intent to draw a connection with Plaintiffs.[18] Plaintiffs also cite an email in which a ViacomCBS employee (not involved in naming the Series) states that Google "automatically assumes" that "florabama" refers to the Lounge, while ignoring the very next email in the chain, which states that results relating to the term's geographic meaning can be found

---

[18] There was nothing unusual about this. Rather, as the Series executive producer explained, it was simply "TV 101": "you have to set everything up for your audience and spoon feed them at the beginning so they understand what the show is about, and then, you know, you don't really have to talk about it again." Doc. 103-4 at 138:19-139:18. Further, the fact that a 495 Productions producer jokingly told cast members during this process that "Floribama is just a bar," Doc. 103-11, sheds no light on the intentions of anyone involved in naming the Series months earlier.

"when you force [G]oogle to spell it Floribama."  Doc. 103-7.  Finally, Plaintiffs rely on inconclusive and hearsay testimony that—again, months after the Series was named—a junior employee in ViacomCBS's marketing department may have floated the idea of installing a billboard near the Flora-Bama Lounge.  Plaintiffs call this the "most egregious[]" evidence of bad intent, Br. 45, but did not even *mention* it in their district court briefing—likely because the billboard was never actually installed.

Even if any of this evidence established that Defendants "copied" Plaintiffs' mark—which it does not—"[t]here is a difference between intentional copying and intentional copying *with intent to cause confusion*."  *Yellowfin Yachts*, 898 F.3d at 1293 (emphasis in original).  Only the latter is relevant.  *Id.*; *J-B Weld*, 978 F.3d at 799-800 (Carnes, J., concurring); McCarthy § 23:113 (relevant intent "must be an intent to confuse, not just an intent to copy. . . . Legitimate copying is what makes a free market economy work").  And while intent to confuse can sometimes be inferred from intent to copy in trade dress cases where the mark at issue has no meaning other than as a source-identifier, *see J-B Weld*, 978 F.3d at 783-85 (product packaging); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986) (same), the inference is not reasonable here, where "Floribama" has a meaning that does not refer to Plaintiffs.

In sum, Plaintiffs' intent evidence does not survive close scrutiny. The district court correctly held that it did not raise a genuine factual issue on the intent factor.

**Actual Confusion (Factor 7).** In cases involving expressive works, this factor necessarily bears less weight, because some risk of confusion must be tolerated in the interest of promoting free expression. *Univ. of Ala.*, 683 F.3d at 1277, 1282. In *Rogers*, for example, the court held that the plaintiff's survey and anecdotal evidence of confusion did not raise a genuine factual issue for trial, because the confusion they demonstrated was "outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression." 875 F.2d at 1001.

In any event, the district court correctly analyzed this factor. In assessing this factor, "the type of person confused" is a relevant consideration, *PlayNation*, 924 F.3d at 1167, as is the "quality" of the evidence, *Anderson*, 477 U.S. at 254. For example, in *PlayNation*, on which Plaintiffs rely, two actual customers testified about their *own* confusion. 924 F.3d at 1167. Here, however, Plaintiffs have offered no testimony from confused persons.

Instead, they rely on eight self-serving declarations from their owners and employees so vague and formulaic that they should be disregarded. *See State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1158-59 (S.D.

Fla. 2015) (conclusory and self-serving declarations "lack any probative value").[19]

Glaringly, six of the eight declarants were not even included on Plaintiffs' witness list for trial.  *See* Doc. 122-03.  One of the two remaining declarations references a communication from a purportedly confused person that was never produced in discovery.  *See* Doc. 103-98 ¶ 2.  Further, the declarations name no purportedly confused person, making any "confusion" unverifiable.

In the absence of first-hand confusion testimony, it is impossible to establish that the anecdotes recounted in the declarations actually reflect trademark confusion. When bar-going bachelorette party attendees ask to meet Series cast members, *see* Doc. 103-93 ¶ 3, for example, the only reasonable inference is that they are joking. *See Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505-06 (5th Cir. 1979) (dismissing magazine commentary as "practically useless" as evidence of confusion because it was impossible to tell whether author was "actually confused, merely speculating, or attempting to be humorous").

The same goes for Plaintiffs' social media evidence.  Most of it consists simply of users misspelling the Series title or Plaintiffs' Mark, which is not probative

---

[19] The affidavit in *University of Georgia Athletic Association v. Laite* was more detailed and reflected much higher levels of confusion than the declarations offered by Plaintiffs: it reflected ten to fifteen instances of confusion in a single week, identified the week at issue, and identified the express statements of the confused persons.  *See* 756 F.2d 1535, 1546 (11th Cir. 1985).

of trademark confusion. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 263 (4th Cir. 2007); *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 504 (2d Cir. 1996). The posts that actually mention both Plaintiffs and the Series establish, at most, that the Series title "called to mind" Plaintiffs (or vice-versa), which also is not trademark confusion as a matter of law. *Yellowfin Yachts,* 898 F.3d at 1295; McCarthy § 23:9. A social media post of Flora-Bama Lounge signage cryptically captioned "MTV IRL" is not enough, standing alone, to raise the inference that the poster believed the Series and Plaintiffs were affiliated, rather than making a flip remark. *Armstrong Cork*, 597 F.2d at 505-06.

Misdirected communications, such as the letter and online message intended for Defendants that Plaintiffs received, are not evidence of a mistaken belief as to source, sponsorship, or affiliation—they simply reflect inattention or carelessness. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002); *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996); *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582-83 (2d Cir. 1991).

Finally, Defendants moved to exclude both of Plaintiffs' confusion experts. Docs. 92, 95. While the district court did not rule on those motions, it evidently concluded that Plaintiffs' confusion survey was too "poorly constructed" to be admissible or warrant consideration. Doc. 188 at 18. Plaintiffs' other expert did little more than review strangers' social media posts and proclaim that they reflected

55

confusion, Doc. 103-77, while admitting at his deposition that he had no basis to make those determinations, Doc. 103-81 at 106:2-108:16.

\*\*\*

To sum up, the two most relevant factors—similarity of the marks and similarity of the goods and services—strongly favor Defendants. The other five factors, while less relevant in light of the First Amendment interests at stake, also favor Defendants. Thus, even accepting the district court's incorrect premise that this is a title-versus-title case, the district court correctly concluded that no reasonable jury could find in Plaintiffs' favor.

## III. Defendants Were Entitled to Summary Judgment Under the Ordinary Likelihood-of-Confusion Test.

The judgment should be affirmed even if this Court concludes that this case is governed by the ordinary likelihood-of-confusion test. As explained above, each of the factors favors Defendants. And viewing the factors "holistically," *Yellowfin Yachts*, 898 F.3d at 1289, Plaintiffs' claims rest entirely on Defendants' use of the single word "Floribama," which has a geographic meaning independent of Plaintiffs, on a television series that is entirely different from Plaintiffs' core businesses. No reasonable jury could find a likelihood of confusion.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants-Appellees respectfully request that this Court affirm the district court's judgment.

56

March 4, 2022                                          Respectfully submitted,

                                                      /s/ *Susan J. Kohlmann*
Adam G. Unikowsky                                     Susan J. Kohlmann
JENNER & BLOCK LLP                                    Alison I. Stein
1099 New York Avenue, NW                              Jacob Tracer
Suite 900                                             Rémi J.D. Jaffré
Washington, DC 20001-4412                             JENNER & BLOCK LLP
(202) 639-6000                                        1155 Avenue of the Americas
                                                      New York, NY 10036-2711
                                                      (212) 891-1600
                                                      skohlmann@jenner.com
Christine Davis
DAVIS APPEALS, PLLC                                   *Counsel for Defendants-Appellees*
1400 Village Square Blvd.
Suite 3-181
Tallahassee, FL 32312
(850) 739-0448

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 11th Cir. R. 32-4 because it contains 12,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman type style.

*/s/ Susan J. Kohlmann*
Susan J. Kohlmann
Dated: March 4, 2022

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on March 4, 2022, I caused **Defendants-Appellees' Brief** to be electronically filed with the Clerk of the Court using CM/ECF, which will send notice of this filing to all counsel of record indicated on the electronic receipt.  I further certify that I will cause four copies of the above named brief to be transmitted to the Clerk of the Court via UPS overnight delivery, delivery charge prepaid within 3 days of this filing date.

*/s/ Susan J. Kohlmann*
Susan J. Kohlmann
Dated: March 4, 2022