No. 21-13458

# United States Court of Appeals
*for the*
# Eleventh Circuit

MGFB PROPERTIES, INC., FLORA-BAMA MANAGEMENT, LLC, and
FLORA-BAMA OLD S.A.L.T.S., INC.,

*Plaintiffs-Appellants,*

– v. –

VIACOMCBS, INC., 495 PRODUCTIONS HOLDINGS, LLC, and 495
PRODUCTIONS SERVICES, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
THE HONORABLE ROBERT L. HINKLE, UNITED STATES DISTRICT
JUDGE

## *AMICI CURIAE* BRIEF OF INTELLECTUAL PROPERTY LAW PROFESSORS IN SUPPORT OF DEFENDANTS-APPELLEES

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in Eleventh Circuit Rule 26.1-2(a) have an interest in the outcome of this case and were omitted from the Certificates of Interested Persons in briefs that were previously filed pursuant to Rule 26.1-2(b).

Mark Bartholomew, University at Buffalo School of Law

Andrew Chin, UNC School of Law

Stacey Dogan, Boston University School of Law

Michael Grynberg, Depaul University School of Law

Stacey M. Lantagne, University of Mississippi School of Law

Mark Lemley, Stanford Law School

Yvette Joy Liebesman, Saint Louis University School of Law

Jessica Litman, University of Michigan Law School

Glynn Lunney, Texas A&M School of Law

William McGeveran, University of Minnesota Law School

Mark P. McKenna, UCLA Law

Tyler T. Ochoa, Santa Clara University School of Law

Lisa Ramsey, University of San Diego School of Law

Betsey Rosenblatt, University of Tulsa College of Law

Jessica Silbey, Boston University School of Law

Rebecca Tushnet, Harvard Law School

Respectfully submitted,

*/s/ Rebecca Tushnet*

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for Defendants-*
*Appellees*

## TABLE OF CONTENTS

IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE ...............1

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT ...................................................................................................3

   I.   THE FULL WEIGHT OF FIRST AMENDMENT PROTECTION
APPLIES TO NONCOMMERCIAL WORKS, INCLUDING THEIR
TITLES ..........................................................................................................3

   II.  THE ROGERS V. GRIMALDI TEST APPLIES TO APPELLEES'
NONCOMMERCIAL SPEECH .........................................................6

     *A.*   *Noncommercial Speech Required Different Treatment from Ordinary
Commercial Speech....................................................................6*

     *B.*   *Rogers Protects Noncommercial Speakers' Interests in Choosing How to
Communicate................................................................................8*

     *C.*   *The Court Need Not Opine on Title-v-Title Conflicts Here....................11*

        *1. A Bar Does Not Have a Title for Rogers Purposes............................11*

        *2. The Circuits Do Not Meaningfully Diverge in Title-v-Title
Situations.....................................................................................15*

        *3. Appellants' Other Arguments Contrary to Rogers Are Unavailing ....17*

   III. APPELLEES' CHOICE OF A RELEVANT TERM IS NOT
EXPLICITLY MISLEADING, EVEN ASSUMING THAT APPELLANTS
WERE THE FIRST TO USE IT ..............................................................19

     *A.*   *Trademark Does Not Protect Being the First to Use a Portmanteau......19*

     *B.*   *Ambiguity Is Not Explicitly Misleading ...................................22*

CONCLUSION ............................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*,
  872 F.2d 1035 (D.C. Cir. 1989) .................................................................... 21

*Board of Trs. v. Fox*,
  492 U.S. 469 (1989) ........................................................................................ 5

*Brown v. Entertainment Merchants Ass'n*,
  564 U.S. 786 (2011) .................................................................................... 4,6

*Brown v. Electronic Arts*
  724 F.3d 1235 (9th Cir. 2013) ................................................................ 23-24

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
  95 F.3d 959 (10th Cir. 1996) ...................................................................... 18

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988) ...................................................................................... 4

*Clairol, Inc. v. Roux Distrib. Co.*,
  280 F.2d 863, 126 USPQ 397 (CCPA 1960) .............................................. 19

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*
  886 F.2d 490 (2d Cir. 1989) .................................................................. 16, 27

*Cohen v. California*,
  403 U.S. 15 (1971) .......................................................................... 9, 18, 21

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) ...................................................................................... 19

*Dr. Seuss Enter., L.P. v. ComicMix, LLC*,
  983 F.3d 443 (9th Cir. 2020) ...................................................................... 22

*Estate of Hemingway v. Random House, Inc.*,
  244 N.E.2d 250 (N.Y. 1968) ........................................................... 13

*Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*,
  252 U.S. 538 (1920) ......................................................................... 21

*FN Herstal SA v. Clyde Armory Inc.*,
  838 F.3d 1071 (11th Cir. 2016) ..................................................... 19

*Hart v. Elec. Arts*,
  717 F.3d 141 (3d Cir. 2013) .............................................................. 5

*Hickson Corp. v. N. Crossarm Co.*,
  357 F.3d 1256 (11th Cir. 2004) ..................................................... 24

*Hoffman v. Capital Cities/ABC, Inc.*,
  255 F.3d 1180 (9th Cir. 2001) ....................................................... 20

*Iancu v. Brunetti*,
  139 S.Ct. 2294 (2019) ........................................................................ 6

*In re Trade–Mark Cases*,
  100 U.S. 82 (1879) ........................................................................... 19

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952) ........................................................................... 3

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
  543 U.S. 111 (2004) ......................................................................... 21

*Liquid Controls Corp. v. Liquid Control Corp.*,
  802 F.2d 934 (7th Cir. 1968) ......................................................... 24

*Matal v. Tam*,
  137 S.Ct. 1744 (2017) ................................................................. 6, 20

*Mattel, Inc. v. MCA Records, Inc.*,
  296 F.3d 894 (9th Cir. 2002) .................................................... 4, 5, 7

*Messenger v. Gruner + Jahr Printing & Publ'g*,
  208 F.3d 122 (2d Cir. 2000).................................................................. 20

*Mil–Spec Monkey, Inc. v. Activision Blizzard, Inc.*,
  74 F.Supp.3d 1134 (N.D. Cal. 2014) ................................................. 23

*Natl. Inst. of Fam. and Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ........................................................................ 8, 9

*New Kids on the Block v. News Am. Publ'g, Inc.*,
  971 F.2d 302 (9th Cir. 1992)............................................................... 7, 9

*Parks v. LaFace Records*,
  329 F.3d 437 (6th Cir. 2003)............................................................... 5, 18

*Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986 (7th Cir. 2004) ........................... 1

*Pursuing America's Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016) ........................................................... 9, 21

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................................ 6, 8

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ............................................................................ 5

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir.1989).......................................................... *passim*

*Smith v. People of California*,
  361 U.S. 147 (1959) ............................................................................ 4

*Stephano v. News Grp. Publ'ns, Inc.*,
  474 N.E.2d 580 (N.Y. 1984).............................................................. 20

*Suzie's Brewery Co. v. Anheuser-Busch Cos.*,
  519 F. Supp. 3d 839 (D. Or. 2021) .................................................... 24

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007)................................................................ 24

*Twentieth Century Fox Television v. Empire Dist. Inc.*,
   875 F.3d 1192 (9th Cir. 2017)......................................................... 17, 24

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993)...........................................................22-23

*U. of Alabama Bd. of Trustees v. New Life Art, Inc.*,
   683 F.3d 1266 (11th Cir. 2012)..................................................... *passim*

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1948) ............................................................................. 3

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000) ............................................................................. 7

*Winters v. New York*,
   333 U. S. 507 (1948) ............................................................................ 3

*Yankee Publ'g Inc. v. News America Publ'g Inc.*,
   809 F. Supp. 267 (S.D.N.Y. 1992)....................................................... 16

Other Authorities

American Society for Mechanical Engineering, The Code: An Authorized History
   of the ASME Boiler and Pressure Vessel Code (1990) .................................14-15

Debra Baker, *Who Wants to Be a Millionaire*, 86 A.B.A. J. 36 (2000) ................ 24

Buffalo Wild Wings Launches iHeartRadio's First Branded Radio Station, Nov.
   12, 2014,
   https://www.businesswire.com/news/home/20141112005208/en/Buffalo-Wild-
   Wings-Launches-iHeartRadio%E2%80%99s-First-Branded-Radio-Station ...... 14

David A. Han, *Middle-Value Speech*,
   91 S. Cal. L. Rev. 65 (2017) ................................................................ 7

iHeartMedia, Advertising, https://www.iheartmedia.com/advertising.................. 13

William McGeveran & Mark P. McKenna, *Confusion Isn't Everything*,
  89 Notre Dame L. Rev. 253 (2013) ........................................................................... 7

Mark A. Lemley & Mark McKenna, *Irrelevant Confusion*,
  62 Stan. L. Rev. 413 (2010) ................................................................................... 26

Glynn Lunney, *Trademark's Judicial De-Evolution: Why Courts Get Trademark Cases Wrong Repeatedly*, 106 Cal. L. Rev. 1195 (2018) ................................. 7, 26

Mark P. McKenna, *Property and Equity in Trademark Law*,
  23 Marq. Intell. Prop. L. Rev. 117 (2019) ........................................................... 24

William McGeveran, *The Imaginary Trademark Parody Crisis (and the Real One)*,
  90 Wash. L. Rev. 713 (2015) ................................................................................... 7

Eric Nadel, The Texas Rangers: The Authorized History (1997) ......................... 14

Zahr K. Said, *Mandated Disclosure in Literary Hybrid Speech*,
  88 Wash. L. Rev. 419 (2013) ................................................................................. 14

Spotify, Sponsored Playlist Ad Specs, https://ads.spotify.com/en-US/ad-experiences/sponsored-playlist-ad-specs/ ............................................................. 13

Starbucks, Starbucks Acoustic,
  https://open.spotify.com/playlist/6prLaAk2sOPeDpJKY6LZZ9 ....................... 13

David A. Strauss, *The Ubiquity of Prophylactic Rules*,
  55 U. Chi. L. Rev. 190 (1988) ................................................................................. 8

## IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE

*Amici* are scholars whose research and teaching focus is trademark and intellectual property law.[1] *Amici* have no direct interest in the outcome of this litigation. Our sole interest is in the orderly development of trademark law to serve the public interest.[2]

## SUMMARY OF ARGUMENT

The gravamen of Appellants' argument is that Appellees copied its mark, and that this use might increase the extent to which consumers recognize Flora-Bama (or any other spelling) as a regional portmanteau rather than only as the name of a bar. But trademark law does not condemn copying as such, nor does it condemn participation in the marketplace of ideas. It is directed at protecting consumers against mistaken purchasing decisions. Even trademark dilution does not cover expanding the meaning of a term. *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 991-93 (7th Cir. 2004). And when a trademark owner alleges that an expressive work

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund the preparation or submission of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief.

[2] *Amici's* institutional affiliations are provided only for purposes of identification.

1

infringes its trademark, courts wisely exercise special care in assessing whether reasonable consumers would be confused, as the district court did here.

This Court has adopted the rule of *Rogers v. Grimaldi* protecting titles (and other aspects) of artistic works from trademark liability if the use is artistically relevant and not explicitly misleading. *U. of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012) (citing *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)). The First Amendment provides strong protection for non-advertising speech, including speech sold or licensed for profit, and *Rogers* implements that protection. The Court should not diverge from *Rogers* in evaluating Appellees' TV series.

In addition, this Court has no reason to wade into the issue of the appropriate treatment of title-v-title conflicts. Flora-Bama is the name of a bar, not the title of a work of authorship. Appellants do not allege that a consumer seeking to go to their bar would mistakenly watch Appellees' series instead, but rather that consumers might believe that there is a relationship between the bar and the series. Title-v-title is a limited exception for the situation in which consumers could be deceived into mistakenly substituting one work for another; it is inapplicable here.

Whether or not Appellants invented the portmanteau Flora-Bama, its use to describe the area is relevant, and it is not explicitly misleading.

2

## **ARGUMENT**

### I. **THE FULL WEIGHT OF FIRST AMENDMENT PROTECTION APPLIES TO NONCOMMERCIAL WORKS, INCLUDING THEIR TITLES**

Over seventy years ago, the Supreme Court held that movies were fully protected by the First Amendment. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 166 (1948) ("We have no doubt that moving pictures, like newspapers and radio, are included in the press whose freedom is guaranteed by the First Amendment."). In *Joseph Burstyn, Inc. v. Wilson*, the Court elaborated:

> It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform. As was said in Winters v. New York, 333 U. S. 507, 510 (1948):
>
> > "The line between the informing and the entertaining is too elusive for the protection of that basic right [a free press]. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine."

343 U.S. 495, 501–02 (1952) (footnotes omitted).

Likewise, the Supreme Court has routinely extended that treatment to other forms of non-advertising speech, even when that speech is sold for profit. *See, e.g.*,

3

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) (video games); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."); *Smith v. People of California*, 361 U.S. 147, 150 (1959) ("It is of course no matter that the dissemination [of books] takes place under commercial auspices."). There can be no doubt that television shows are entitled to the same treatment.

The governing distinction between commercial speech—the province of ordinary trademark law—and fully First Amendment-protected speech is not whether a speaker is profit-seeking, but whether the speech sought to be regulated is commercial in the sense of proposing a commercial transaction. In other words: Is the speech merely an ad for something other than itself? Or is the speech itself the thing audiences are invited to purchase? "If speech is not purely commercial— that is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection." *Mattel, Inc. v. MCA Records*, *Inc.*, 296 F.3d 894, 900 (9th Cir. 2002).

The level of First Amendment protection does not change because a title helps promote or sell the underlying work in some sense. The fact that titles' artistic and expressive functions are "inextricably intertwined" with works' commercial elements means that the proper First Amendment standard is that

4

governing noncommercial speech. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("[W]e do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech"). There is no way to suppress the commercial aspects of the title without suppressing the noncommercial aspects, because the restraint would be on the communicative use of the title *itself*. This is unlike situations in which specific commercial pitches could be excised from otherwise noncommercial material. *Compare Board of Trs. v. Fox*, 492 U.S. 469 (1989) (finding educational presentations in "Tupperware parties" separable from accompanying sales pitches), *with*, *e.g.*, *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903, 906-07 (9th Cir. 2002) (the commercial purpose of using "Barbie" in a song title was "inextricably intertwined" with the "expressive elements" of the song) (citations omitted), *and Parks v. LaFace Records*, 329 F.3d 437, 449 (6th Cir. 2003) ("[I]f a song is sold, and the title is protected by the First Amendment, the title naturally will be 'inextricably intertwined' with the song's commercial promotion.") (citations omitted); *see also Hart v. Elec. Arts*, 717 F.3d 141, 154 (3d Cir. 2013) (test that tries to weigh expression against commerciality "is subjective at best, arbitrary at worst, and in either case calls upon judges to act as both impartial jurists and discerning art critics. These two roles cannot co-exist . . . . [It is improper] for

courts to analyze select elements of a work to determine how much they contribute to the entire work's expressiveness.").

The content of noncommercial speech may be regulated only to further a compelling government interest; the regulation must be narrowly tailored and must be the least restrictive means of accomplishing that compelling interest. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). The relief the Appellants seek in this case satisfies neither of these requirements.

## II. THE ROGERS V. GRIMALDI TEST APPLIES TO APPELLEES' NONCOMMERCIAL SPEECH

### A. Noncommercial Speech Requires Different Treatment from Ordinary Commercial Speech

Invoking trademark law does not change the level of constitutional protection to which noncommercial speech is entitled. The Supreme Court's recent trademark cases highlight the important noncommercial aspects of trademarks and emphasize that the regulation of trademarks must focus on their commercial aspects. *Matal v. Tam*, 137 S.Ct. 1744, 1752, 1760 (2017) (noting that trademarks routinely express more than source indication, and the expressive dimensions of the marks warrant First Amendment protection); *Iancu v. Brunetti*, 139 S.Ct. 2294 (2019) (same).

6

In addition, the multifactor likelihood of confusion analysis is costly and time-consuming, and it has long been recognized that forcing defendants to litigate confusion in detail chills expression. *Mattel*, 296 F.3d at 900-02 (9th Cir. 2002); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306-08 (9th Cir. 1992); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 214 (2000) ("Competition is deterred . . . not merely by successful suit but by the plausible threat of successful suit . . . ."); William McGeveran, *The Imaginary Trademark Parody Crisis (and the Real One)*, 90 WASH. L. REV. 713, 745-53 (2015) (emphasizing the importance of clear rules that can be applied early in litigation in order to protect speech); William McGeveran & Mark P. McKenna, *Confusion Isn't Everything*, 89 NOTRE DAME L. REV. 253 (2013) (same); Elizabeth L. Rosenblatt, *Rethinking the Parameters of Trademark Use in Entertainment*, 61 FLA. L. REV. 1011 (2009) (discussing harms of applying multi-factor test to noncommercial expression); *cf.* Glynn Lunney, *Trademark's Judicial De-Evolution: Why Courts Get Trademark Cases Wrong Repeatedly*, 106 CAL. L. REV. 1195 (2018) (explaining that the costs of litigation mean that complex tests for liability in trademark law will inevitably suppress legitimate uses even if those uses would be protected after full-scale litigation).

Courts have therefore adopted various doctrines to protect First Amendment-protected speech from the chilling effects of potential Lanham Act liability. *Rogers*

*v. Grimaldi*, adopted by this Court in *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012), is one such doctrine.

### B. *Rogers* Protects Noncommercial Speakers' Interests in Choosing How to Communicate

The test articulated in *Rogers v. Grimaldi* strongly protects noncommercial speech.[3] It recognizes that standard trademark law, which in its usual application is directed at unequivocally commercial speech, such as the label of a can of peas, is ill-suited to analyze noncommercial speech.[4]

In *Rogers*, the Second Circuit considered the actress Ginger Rogers's claim against the producers of *Ginger and Fred*, a Fellini film about two Italian cabaret performers who made a living by imitating Ginger Rogers and Fred Astaire. Rogers argued that the use of her name violated the Lanham Act by creating the

---

[3] Indeed, the Supreme Court's recent noncommercial speech precedents, *see, e.g.*, *Reed*, 576 U.S. at 155-56, *Natl. Inst. of Fam. and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371-73 (2018), suggest that the *Rogers* test may not go far enough to protect noncommercial speech, because it fails to examine whether the government has a compelling interest in preventing a particular alleged likelihood of deception, including by failing to assess whether any deception is material.

[4] See also David A. Han, Middle-Value Speech, 91 S. CAL. L. REV. 65, 83 (2017) (explaining that prophylactic rules can be justified "simply to limit the chilling effects on speech that would result from a more complex and nuanced doctrinal structure"); David A. Strauss, The Ubiquity of Prophylactic Rules, 55 U. CHI. L. REV. 190, 190 (1988) (arguing that courts regularly and legitimately craft prophylactic rules to protect constitutional values).

false impression that she was involved with its making or otherwise endorsed the film. 875 F.2d at 997.

But titles are inextricably part of the protected expression of a work. *Rogers* explained:

> The title of a movie may be both an integral element of the filmmaker's expression as well as a significant means of marketing the film to the public. The artistic and commercial elements of titles are inextricably intertwined. Filmmakers and authors frequently rely on word-play, ambiguity, irony, and allusion in titling their works. Furthermore, their interest in freedom of artistic expression is shared by their audience. The subtleties of a title can enrich a reader's or a viewer's understanding of a work. Consumers of artistic works thus have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression. For all these reasons, the expressive element of titles requires more protection than the labeling of ordinary commercial products.

*Rogers*, at 998; *see also Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 510 (D.C. Cir. 2016) (title or name is a "critical" way to identify an entity); *cf. Cohen v. California*, 403 U.S. 15, 26 (1971) ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process."); *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d at 306 ("[W]e need not belabor the point that some words, phrases or symbols better convey their intended meanings than others.").

The *Rogers* court therefore recognized both that "Rogers' name has enormous drawing power in the entertainment world," such that controlling its use

9

was of value to her, and also that movies were "indisputably works of artistic

expression and deserve protection." *Id* at 998. The title was part of the film's

noncommercial speech, and protection of the freedom to engage in noncommercial

speech is ordinarily is more important than Lanham Act interests: "We believe that

in general the Act should be construed to apply to artistic works only where the

public interest in avoiding consumer confusion outweighs the public interest in free

expression." *Id.* at 999. As a result, "the balance will normally not support

application of the Act unless [the use of the trademark] has no artistic relevance to

the underlying work whatsoever, or if it has some artistic relevance, unless [the use

of the trademark] explicitly misleads as to the source or content of the work." *Id.*

Because use of Ginger Rogers's name was clearly artistically relevant and did not

explicitly mislead, the court rejected Rogers' claim even in the face of both survey

and anecdotal evidence of consumer confusion. *Id.* at 1001.

Appellees' television series fits clearly on the *Rogers*-protected side of the

line: Appellees make money by selling or licensing their speech itself, not by using

the title of their series to advertise nonspeech products. And the title of the series

exemplifies the expressive function noted in *Rogers*: The title reflects, and

provides a key to understanding, the rest of the content of the audiovisual works:

the goings-on of individuals on the Florida-Alabama coast. That is precisely what

artistic relevance is about, and there is nothing explicitly misleading about the title.

### C. This Court Need Not Opine on Title-v-Title Conflicts Here

*1. A Bar Does Not Have a Title for* Rogers *Purposes*

In any event, whether there are any practical differences between these approaches is a question for another day, because this is not a title-v-title situation. Appellants try to manufacture a title-v-title dispute by claiming rights based on their bar, then identify titles of expressive works that refer to the name of the bar. That is not how trademark law works. Regardless of whether they allowed or even "licensed" the uses, they do not establish that those titles function as trademarks for goods and services, rather than as references to the bar.

As the district court noted, "[t]he plaintiffs' use of its mark Flora-Bama relates primarily to its facility, not to the title of an artistic work." 5:19cv257-RH-MJF at *15. Despite this, the court reasoned that the bar's name "has occasionally been used in the title to artistic works, and in any event, artistic works are performed at the Flora-Bama." *Id.* Likewise, Appellants claim that their bar has been "celebrated and featured in the titles of various artistic works, including works in film, television, videos, radio, books, and song." App. Br. at 3. They do not, however, provide any evidence that they own interests in those works *as trademarks for their goods or services*—the foundation of trademark rights. Appellants had the opportunity on summary judgment to show that they owned

11

trademarks for television shows or songs, but all they could show was that these works made referential or nominative uses of their bar's name.

If this were a title-v-title conflict, the concern would be that consumers might seek one work and get another. But Appellees' argument is not that consumers looking for a country song about the bar or for a music special filmed at the Flora-Bama bar will end up mistakenly watching a reality show about young people at the beach. That argument isn't plausible. Instead, their argument is exactly the argument rejected in *Rogers* and *New Life*: that, because of the content of an expressive work, consumers might think that the work was licensed by the Appellants.  Even assuming that Appellants seek to build a media empire via licensing the name of their bar, that does not distinguish them from Ginger Rogers or the University of Alabama, who had far more substantial presence in nationwide media than Appellants do and whose structurally identical claims failed. *Rogers*, 875 F.3d at 996, *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc*., 683 F.3d 1266, 1276 (11th Cir. 2012).

Nothing about the Second Circuit's decision would have changed if Ginger Rogers had authorized a movie, *Ginger Rogers: Her Story*. Such a title would still be a referential use of her name, rather than possessing trademark meaning in itself. *See Rogers*, 875 F.2d at 1000 (while a biography falsely labeled "authorized" could be actionable, a biography merely using the subject's name and

12

possibly implying authorization would not (citing *Estate of Hemingway v. Random House, Inc.*, 244 N.E.2d 250, 260 (N.Y. 1968), for the proposition that estate of Ernest Hemingway "had no cause of action for 'palming off' or 'unfair competition' against author of biographical memoir entitled 'Papa Hemingway'")). By contrast, if there are two cookbooks entitled "Recipes From Mama's Kitchen," and one is very well-known as the trademark for a cookbook, a consumer might conceivably buy one when intending to buy the other. But no one is mistaking a reality TV show for a bar, so the *Rogers* footnote, whatever it may mean, is not applicable here.

Accepting Appellants' arguments would allow any trademark owner to evade the speech-protective rule of *Rogers*. For example, Spotify allows any brand to create a playlist,[5] and Starbucks Coffee has created many playlists, including Starbucks Acoustic.[6] "Starbucks" does not thereby become a title of an expressive work; "Starbucks Acoustics" rather remains a *reference* to a non-expressive service contained in a playlist title. (The same is true for branded stations on iHeartRadio.[7]) Likewise, Cheerios licenses some publishers to make books

---

[5] *See* Sponsored Playlist Ad Specs, https://ads.spotify.com/en-US/ad-experiences/sponsored-playlist-ad-specs/.

[6] *See* Starbucks Acoustic, https://open.spotify.com/playlist/6prLaAk2sOPeDpJKY6LZZ9.

[7] *See* Advertising, https://www.iheartmedia.com/advertising (offering "countless advertising and partnership opportunities [including] unique branded custom

featuring Cheerios. *See generally* Zahr K. Said, *Mandated Disclosure in Literary Hybrid Speech*, 88 WASH. L. REV. 419, 427-32 (2013) (exploring the variety of sponsorships in film, television, literature, and other media). This licensing relationship in no way means that an unauthorized book about Cheerios gets less First Amendment protection than an unauthorized book about Trader Joe's O's.

To hold otherwise would mean that, because Ford Motor Co. has published corporate histories in its name, sponsors Masterpiece Theater, and creates extensive social media content, "Ford Motor Company" was now a title for *Rogers* purposes. Accepting Appellants' argument in this case would therefore open the door to litigation over whether a critical history of Ford that uses Ford in its title constituted trademark infringement and chill valuable creative expression.

Indeed, given that nearly every trademark owner now creates a substantial amount of content on social media, every one of them could evade *Rogers* on a similar theory. But these activities, like the existence of *The Texas Rangers: The Authorized History*[8] or *The Code: An Authorized History of the ASME Boiler and*

---

stations crafted by iHeartMedia's world class programming"); Buffalo Wild Wings Launches iHeartRadio's First Branded Radio Station, Nov. 12, 2014, https://www.businesswire.com/news/home/20141112005208/en/Buffalo-Wild-Wings-Launches-iHeartRadio%E2%80%99s-First-Branded-Radio-Station.
[8] *See* https://www.amazon.com/Texas-Rangers-Authorized-History/dp/0878331395.

14

*Pressure Vessel Code*[9] does not make any of these entities into "titles" for purposes of the title-v-title situation hypothesized in *Rogers*. Whatever the proper rule for title-v-title disputes, courts should not allow trademark owners' strategic decisions to license certain expressive works to become a justification for giving them control over other expressive works. That would open the door to censorship.

The district court similarly erred in apparently concluding that, because songs are performed at a venue, the venue is therefore an "artistic work" with a "title." On this rationale, Duke Energy could avoid *Rogers* when other people speak about it because it paid to put its name on the Duke Energy Center for the Arts in St. Petersburg, Florida, as could the trademark owners who put their names on the Amway Center (Orlando), iTHINK Financial Financial Amphitheatre (West Palm Beach), MidFlorida Credit Union Amphitheatre (Tampa Bay), VyStar Veterans Memorial Arena (Jacksonville), and Tropicana Field (St. Petersburg), as well as hundreds more venues around the country.

### 2. *The Circuits Do Not Meaningfully Diverge in Title-v-Title Situations*

A footnote in *Rogers* indicated that the court was not creating a rule for "misleading titles that are confusingly similar to other titles." *Rogers*, 875 F.2d at

---

[9] *See* https://www.asme.org/publications-submissions/books/find-book/code-authorized-history-asme-boiler-pressure-vessel-code/print-book.

999 n.5. However, in its few subsequent title-v-title cases, the Second Circuit held that the animating principle of *Rogers* always requires special First Amendment scrutiny whenever a trademark claimant asserts rights to control noncommercial expression. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ. Group, Inc.* 886 F.2d 490, 495 n.3 (2d Cir. 1989) ("The *Polaroid* [multifactor likely confusion] test has its origin in cases of purely commercial exploitation, which do not raise First Amendment concerns. Thus, the *Polaroid* test is at best awkward in the context of [work which] constitutes original expression.").

And such scrutiny is only logical: a title retains its expressive significance and full First Amendment protection regardless of the source of rights claimed by the challenger. *See id.* at 497. While the Second Circuit purports to use a modified multifactor likelihood-of-confusion test in title-v-title cases, it does so with an eye to allowing maximum freedom of expression, primarily by (1) heavily weighting the presence of a "house mark" or other indication of the actual publisher of the challenged work against likely confusion and (2) treating "reasonable consumers" of expressive works as ordinarily capable of distinguishing among similar titles. *Id.* at 495–96; *Yankee Publ'g Inc. v. News America Publ'g Inc.*, 809 F. Supp. 267, 274-75 (S.D.N.Y. 1992).

In essence, when the producer of a new work properly indicates that the work is its own—such as by broadcasting it on its own branded channel—the

Second Circuit reaches the same no-infringement result in title-v-title cases as in *Rogers*. This makes sense, because an expressive work is not explicitly misleading when consumers can easily detect its source.

The Ninth Circuit has explicitly held that the *Rogers* test applies in all cases in which the trademark claimant is trying to suppress noncommercial speech. "The only threshold requirement for the *Rogers* test is an attempt to apply the Lanham Act to First Amendment expression." *Twentieth Century Fox Television v. Empire Dist. Inc.*, 875 F.3d 1192, 1198 (9th Cir. 2017). The Ninth Circuit thus determined that the artistic relevance/explicit misleadingness test was appropriate across the board for determining when fully First Amendment-protected works could be held liable for trademark infringement. *Id.* at 1196–97.

Regardless of approach, no court of appeals has used the *Rogers* footnote to strip titles of expressive works of the First Amendment protection accorded to noncommercial speech.

### 3. *Appellants' Other Arguments Contrary to Rogers Are Unavailing*

Appellants encourage the Court to substitute its own judgment as to whether there were acceptably similar ways to communicate the same message. *See, e.g.,* Appellants' Br. at 20 (insisting that there was "no need for Defendants to use Plaintiffs' trademark"). But *Rogers* and other cases rightly reject an "alternative

17

avenues" inquiry. Such an approach is relevant to restrictions on the timing or sound volume of speech, but inappropriate as applied to content-based restrictions on the words a defendant can use. *See Rogers*, 875 F.2d at 999 n.4 (rejecting judicial scrutiny of possible alternative titles); *Parks*, 329 F.3d at 450 ("To suggest that other words can be used as well to express an author's or composer's message is not a proper test for weighing First Amendment rights."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 971 (10th Cir. 1996) ("Intellectual property ... includes the words, images, and sounds that we use to communicate, and 'we cannot indulge in the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process.'") (quoting *Cohen*, 403 U.S. at 26).

Likewise, Appellants claim that "[t]he district court wrongly elevated Defendants' exercise of their First Amendment rights over Plaintiffs' First Amendment rights." Appellants' Br. at 36. But where the Appellee seeks to speak, the Appellant seeks to restrict speech. The ability to suppress another's speech is not itself a First Amendment right. Unsurprisingly, Appellant does not explain how Appellees' use of a series title constitutes government-backed punishment of Appellants' speech. Instead, Appellant seeks insulation from the marketplace of ideas and the ability of others to participate in the creation of meaning.

### III. APPELLEES' CHOICE OF A RELEVANT TERM IS NOT EXPLICITLY MISLEADING, EVEN ASSUMING THAT APPELLANTS WERE THE FIRST TO USE IT

#### A. Trademark Does Not Protect Being the First to Use a Portmanteau

It is a fundamental principle of trademark law that creativity is neither necessary nor sufficient for trademark rights. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) ("[f]ederal trademark law 'has no necessary relation to invention or discovery'") (quoting *In re Trade–Mark Cases*, 100 U.S. 82, 94 (1879)); *id.* at 37 ("the Act's common-law foundations … were *not* designed to protect originality or creativity") (emphasis in original); *see also FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1082 (11th Cir. 2016) (distinguishing invention from trademark rights); *Clairol, Inc. v. Roux Distrib. Co.*, 280 F.2d 863, 126 USPQ 397, 398 (CCPA 1960) (even novel ways of referring to a product may nonetheless be merely descriptive). Trademarks are neither patents nor copyrights.

Even if Appellants were the first to mash up Florida and Alabama into the portmanteau term Flora-bama, that combination's obvious utility in describing a geographic area cannot be ignored, either as a matter of trademark law or as a matter of First Amendment law. The First Amendment generally protects the right of speakers to choose their topics and the ways in which they want to speak about those topics. This includes the choice of techniques to attract attention in

19

nondefamatory ways. *See, e.g.*, *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185-86 (9th Cir. 2001) (defendant magazine's use of an altered film photo to "attract attention" as part of use of celebrities to "rev up" its image did not diminish First Amendment protection). At the core of the idea of First Amendment-protected "newsworthiness" is that matters of legitimate public interest attract attention, and attracting attention is a perfectly legitimate goal for a for-profit publication, as for any other speaker. *See, e.g.*, *Messenger v. Gruner + Jahr Printing & Publ'g*, 208 F.3d 122, 126 (2d Cir. 2000) (holding that a use "solely or primarily to increase the circulation" and profits of a newsworthy article is still fully protected; "most publications seek to increase their circulation and also their profits") (citing *Stephano v. News Grp. Publ'ns, Inc.*, 474 N.E.2d 580, 585 (N.Y. 1984)).

There is both an obvious artistic reason to choose a geographically descriptive term as a title and an equally obvious marketing function. Using *Floribama Coast* tells audiences the subject matter of the shows. The artistic and profit-driven motivations are unified. This situation demonstrates the wisdom of the First Amendment's protection not just for speakers' choices of topics, but also for their choices of how to speak about those topics. *See, e.g.*, *Matal*, 137 S.Ct. at 1760 (opinion of four Justices) ("powerful messages can sometimes be conveyed in just a few words," and trademarks therefore implicate the First Amendment);

20

*Cohen*, 403 U.S. at 26 (the First Amendment protects the choice of how best to communicate a message); *Pursuing America's Greatness*, 831 F.3d at 510 (title/name is a "critical" way to identify a subject of speech).

Trademark law has always recognized that descriptive terms in particular must be available to all parties seeking to describe the nature of their goods or services. *See, e.g.*, *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 119, 122 (2004) (trademark law has long protected truthful descriptive uses even in the presence of confusion; trademark law does not countenance someone obtaining "a complete monopoly on use of a descriptive term simply by grabbing it first") (citation omitted); *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 544 (1920) (explaining pro-competitive justifications for allowing descriptive use even if some consumer confusion results).

Consistent with these principles, trademark law can provide protection for consumers against material deception in purchasing decisions, including in the marketplace for expressive works,[10] but it should not provide trademark claimants with the means to prevent speakers from using descriptive titles for their works.

---

[10] As discussed above, clear labeling of the actual source—here, MTV—is a simple way to protect against material deception about the source of noncommercial speech. *See, e.g.*, *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035 (D.C. Cir. 1989) (requiring defendant to use reasonable means to prevent confusion but not requiring change of name).

And the trademark infringement test applied to communicative works should be

narrowly tailored to avoid the risks of government intervention into the content of

communicative works.

### B. Ambiguity Is Not Explicitly Misleading

To establish that the use of a mark is explicitly misleading, plaintiffs must

surmount a "high bar that requires the use to be an explicit indication, overt claim

or explicit misstatement about the [work's] source." *Dr. Seuss Enter., L.P. v.

ComicMix, LLC*, 983 F.3d 443, 462 (9th Cir. 2020). *Rogers* "insulates from

restriction titles with at least minimal artistic relevance that are ambiguous or only

implicitly misleading." *Rogers*, 875 F.2d at 1000. Appellants' theory of confusion

is that the similarity between the series title and the bar's name will lead audiences

to infer that there is a sponsorship or endorsement relationship between the parties

because. But that inference is not based on anything explicit in Appellees' uses.

This theory was addressed and rejected in *Rogers*, which held that implicit

misleadingness is insufficient to condemn the title of an expressive work.

Where the "artistic relevance" test is easy to satisfy, the "explicitly

misleading" exception is sharply limited. As the Second Circuit has noted, it is not

enough that a likelihood of confusion exists. In light of the First Amendment

concerns at stake for noncommercial speech, this finding must be "particularly

compelling." *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379

(2d Cir. 1993). Because it cannot be enough to argue that an expressive use itself is misleading, *Rogers* did not reincorporate the multifactor likely confusion test into the "explicitly misleading" element. *See, e.g.*, *Brown v. Electronic Arts*, 724 F.3d 1235, 1245 (9th Cir. 2013) ("It is well established that the use of a mark alone is not enough to satisfy [the explicit misleadingness] prong of the Rogers test."); *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1279 (11th Cir. 2012) ("The extent of his use of the . . . trademarks is their mere inclusion. . . Even if "some members of the public would draw the incorrect inference that [the University] had some involvement... that risk of misunderstanding, not engendered by any overt or . . . even implicit claim ... is so outweighed by the interest in artistic expression as to preclude any violation of the Lanham Act") (quoting *Rogers*, 875 F.2d at 1001); *Mil–Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1144 (N.D. Cal. 2014) (use of claimed mark in promotional materials for video game was not explicitly misleading where actual source of game was clear).

When a use requires the audience to draw the inference of sponsorship or endorsement, it is not explicitly misleading. *Rogers*, 875 F.2d at 1000; *see also id.* at 1001 (rejecting any reliance on survey evidence showing that the public did tend to misunderstand Rogers' involvement in the film, because that misunderstanding was "not engendered by any overt claim"); *see Brown*, 724 F.3d at 1245 (holding

that survey evidence showing that the majority of consumers believe that identifying marks cannot be included in games without permission "changes nothing" in the *Rogers* analysis without explicit misleadingness); *Twentieth Century Fox*, 875 F.3d at 1199.

Courts' treatment of this distinction between explicit and implicit in Lanham Act § 43(a)(1)(B) false advertising cases, 15 U.S.C. § 1125(a)(1)(B), is consistent with the treatment of ambiguity in *Rogers*, and it can further guide the analysis here. *See Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004) (distinguishing literally false from ambiguous messages); *cf. Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("[O]nly an unambiguous message can be explicitly false. Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the[n it] . . . cannot be literally false."); *Suzie's Brewery Co. v. Anheuser-Busch Cos.*, 519 F. Supp. 3d 839, 846 (D. Or. 2021) ("[I]f the language . . . is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.").

One ready way to avoid explicit misleadingness in a case where the challenged use involves a title is through labeling of the actual source. (This is also the reason that the results in the Ninth and Second Circuit title-v-title cases are consistent with each other despite the formal variation in the tests they use.) When the producer or publisher of a work identifies itself, that identification can remove

24

uncertainty about what explicit message is being communicated. Thus, Debra Baker's article *Who Wants to Be a Millionaire?* in the ABA Journal is not explicitly misleading about its lack of connection with the well-known television show. Debra Baker, *Who Wants to Be a Millionaire?*, 86 A.B.A. J. 36 (2000). Baker has clearly identified herself as the author.

Recognizing the importance of labeling is consistent with trademark's historical relationship to unfair competition law. Even when trademark protection is not available to wholly prevent a use, courts may bar "passing off" and require competitors to distinguish themselves, for example by using a "house mark" such as a publisher or network name. *See* Mark P. McKenna, *Property and Equity in Trademark Law*, 23 MARQ. INTELL. PROP. L. REV. 117 (2019); *see also Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 940 (7th Cir. 1968) (explaining that "passing off" occurs when consumers think they are dealing with one party but are really dealing with another). Here, it is undisputed that audiences would see the show on Appellees' heavily branded network, thus identifying its source.

A broad and amorphous range of "confusion" is actionable under modern trademark law in ordinary commercial speech cases. When both parties sell ordinary non-speech goods, trademark owners can sue, and even win, on the theory that consumers might think that the parties had some sort of relationship, even

though consumers understand with whom they are dealing.  Lunney, *supra*, at 1208–1213; Mark A. Lemley & Mark McKenna, *Irrelevant Confusion*, 62 STAN. L. REV. 413, 422–26 (2010). *Rogers* recognizes that, for noncommercial speech, such expansive theories are inconsistent with the First Amendment. This is especially true when the consumer can easily tell who is *actually* speaking. No substantial consumer protection purpose is served by additionally requiring a trademark owner's permission for the speech.

## <u>CONCLUSION</u>

Where allegations of consumer confusion clash with expressive interests, courts have recognized the need for a test that not only gives the expressive interests adequate protection, but also enables quick resolution of claims in order to avoid the speech-chilling effects of plausible but ill-founded lawsuits or threats. In all cases involving challenges to titles of expressive works, the First Amendment therefore requires courts to construe the Lanham Act "narrowly" and grant titles "more [First Amendment] protection than the labeling of ordinary commercial products." *Cliffs Notes*, 886 F.2d at 494-95. *Rogers* does that job well, and it should be applied here.

Respectfully submitted,

*/s/ Rebecca Tushnet*
REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

27

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rules of Appellate

Procedure 29(a)(5) and 32(a)(7)—which set the limitation for an amicus brief at

one half of the maximum length authorized for a party's principal brief (i.e., 6,500

words)—because excluding the parts of the brief exempted by Federal Rule 32(f),

the brief contains 6110 words on the basis of a count made by the word processing

system used to prepare the brief.

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 6, I hereby

certify that this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

*/s/ Rebecca Tushnet*
REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

28

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2022, a copy of the foregoing is being filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Rebecca Tushnet*

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae